# EXHIBIT 1

## REDACTED VERSION OF DOCUMENT TO BE SEALED

1              IN THE UNITED STATES DISTRICT COURT
                   EASTERN DISTRICT OF MICHIGAN
2

3
        IN RE:
4       FLAGSTAR DECEMBER 2021 DATA    ) Case No.
        SECURITY INCIDENT LITIGATION, ) 4:22-cv-11385
5       _____)

6

7             The videotaped deposition of JENNIFER

8       CHARTERS, called by the Plaintiffs for examination,

9       pursuant to notice and pursuant to the Federal Rules

10      of Civil Procedure for the United States District

11      Courts pertaining to the taking of depositions, taken

12      before Michelle A. Duzan, Certified Shorthand

13      Reporter and Registered Merit Reporter, at Skadden,

14      Arps, Slate, Meagher & Flom, LLP, 155 North Wacker

15      Drive, 28th Floor, Chicago, Illinois, commencing at

16      the hour of 10:37 a.m. on the 9th day of January,

17      A.D., 2024.

18

19

20

21

22

23

24

**IN RE: FLAGSTAR DECEMBER 2021 DATA SECURITY INCIDENT LITIGATION**
Jennifer Charters on 01/09/2024

Page 2

```
 1   A P P E A R A N C E S:

 2
         MORGAN & MORGAN
 3       COMPLEX LITIGATION GROUP, By
         MR. PATRICK A. BARTHLE II
 4       201 North Franklin Street, 7th Floor
         Tampa, Florida  33602
 5       813-223-5505
         E-mail:  pbarthle@forthepeople.com
 6
         AND
 7
         STUEVE SIEGEL HANSON, LLP, By
 8       MS. JORDAN A. KANE
         460 Nichols Road, Suite 200
 9       Kansas City, Missouri  64112
         816-714-7100
10       E-mail:  kane@stuevesiegel.com

11           On behalf of the Plaintiffs;

12
         SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP, By
13       MS. MARCIE LAPE
         MS. LINDSEY SIELING
14       155 North Wacker Drive, 28th Floor
         Chicago, Illinois  60606
15       312-407-0917
         E-mail:  marcie.lape@skadden.com
16               lindsey.sieling@skadden.com

17           On behalf of the Defendant.

18
     ALSO PRESENT:
19
         Ms. Jennifer Stout, Esq., Flagstar
20
         Ms. Amanda Yonushatis, videographer
21

22                       *    *    *    *

23

24
```

**IN RE: FLAGSTAR DECEMBER 2021 DATA SECURITY INCIDENT LITIGATION**
Jennifer Charters on 01/09/2024

Page 3

```
 1                       I N D E X

 2   WITNESS                 DX   CX   RDX   RCX

 3   JENNIFER CHARTERS

 4       By Mr. Barthle          5

 5

 6
                       E X H I B I T S
 7

 8       Charters
         DEPOSITION EXHIBIT                MARKED FOR ID
 9
         No. 17    Stipulated Protective Order      6
10       No. 18    Plaintiffs' Amended Notice
                   of Videotaped Deposition of
11                 Jennifer Charters             10
         No. 19    Declaration of
12                 Jennifer Charters             14
         No. 20    Excerpt of individual data
13                 impacted                      16
         No. 21    Fax                           35
14       No. 22    Kroll SOWs and agreements      70

15   Previously marked
         No. 11    Gmail e-mails
16                 FLAG-DEC-00000016 - 18        56
         No. 12    Gmail e-mails
17                 FLAG-DEC-00000019 - 27        46
         No. 13    Gmail e-mails
18                 FLAG-DEC-00000028 - 35        60

19

20

21

22

23

24
```

**IN RE: FLAGSTAR DECEMBER 2021 DATA SECURITY INCIDENT LITIGATION**
Jennifer Charters on 01/09/2024

```
 1              THE VIDEOGRAPHER:  We are now on the record

 2   in the matter of Flagstar December 2021 Data Security

 3   Incident Litigation in the United States District

 4   Court, Eastern District of Michigan, Case Number

 5   4:22-cv-11385.  Today's date is January 9th, 2024,

 6   and the time is now 10:38 a.m.

 7              This is the videorecorded deposition of

 8   Jennifer Charters.  We are located at 155 North

 9   Wacker Drive in Chicago, Illinois.  My name is Amanda

10   Yonushatis, and the court reporter is Michelle Duzan.

11              For the record, would counsel please

12   introduce themselves and who they represent?

13              MR. BARTHLE:  Patrick Barthle, Morgan &

14   Morgan, on behalf of the plaintiffs.

15              MS. KANE:  Jordan Kane from Stueve, Siegel,

16   Hanson on behalf of the plaintiffs.

17              MS. LAPE:  Marcie Lape from Skadden Arps on

18   behalf of defendant.

19              MS. SIELING:  Lindsey Sieling from Skadden

20   Arps on behalf of the defendant.

21              MS. STOUT:  My name is Jennifer Stout.  I'm

22   with the Flagstar Bank as in-house counsel.

23                     (Reporter clarification.)

24              MS. STOUT:  Jennifer Stout.  I'm with
```

**IN RE: FLAGSTAR DECEMBER 2021 DATA SECURITY INCIDENT LITIGATION**
Jennifer Charters on 01/09/2024

Page 5

1  Flagstar Bank as in-house counsel.

2          THE VIDEOGRAPHER:  The court reporter will

3  now swear in the witness.

4                    (Witness duly sworn.)

5                  JENNIFER CHARTERS,

6  called as a witness herein, having been first duly

7  sworn, was examined and testified as follows:

8                  DIRECT EXAMINATION

9  BY MR. BARTHLE:

10     Q.   Ms. Charters, thank you for being here.  My

11  first question is, can you state your full name for

12  the record?

13     A.   Jennifer Charters.

14     Q.   And are you familiar with the Stipulated

15  Protective Order in this case?

16     A.   No.

17     Q.   Do you know whether you've signed the

18  acknowledgment so that we can show you confidential

19  documents?  I mean, they're Flagstar's documents

20  but...

21     A.   I guess I'm not sure what document you're

22  referring to.  I signed a declaration, but I am not

23  aware of signing another document, but...

24          MR. BARTHLE:  We'll just mark this as 17.

**IN RE: FLAGSTAR DECEMBER 2021 DATA SECURITY INCIDENT LITIGATION**
Jennifer Charters on 01/09/2024

Page 6

```
 1                    (Whereupon, Deposition

 2                     Exhibit No. 17 was marked.)

 3          MR. BARTHLE:  All right.  I only brought one

 4     because I assume you'll have it but...

 5     BY MR. BARTHLE:

 6       Q.   Have you ever seen that document before?

 7       A.   No, I do not believe I've ever seen this

 8     document before.

 9       Q.   This is -- it's called a Stipulated

10     Protective Order.  It governs the documents that are

11     produced in this case and who we can show them to and

12     how we can show them.  And pursuant to those

13     provisions, certain documents, for me to be able to

14     show them to you, you have to agree to be bound by

15     this.  The last page, maybe two pages is an agreement

16     where you can sign that.

17          MS. LAPE:  I don't have the protective order

18     memorized.  Are you planning to show her documents

19     produced just by Flagstar?

20          MR. BARTHLE:  Yes, but I believe even for

21     parties, they have to sign the acknowledgement,

22     parties as defined as employees and all that.

23          MS. SIELING:  I think the --

24          THE WITNESS:  Sorry if I'm taking a long
```

IN RE: FLAGSTAR DECEMBER 2021 DATA SECURITY INCIDENT LITIGATION
Jennifer Charters on 01/09/2024

Page 7

1   time.  I just want to know what I'm signing.

2          All right.  Does someone have a pen I could

3   use?  Thank you.

4          (Witness signs exhibit.)

5          Today is the 9th?

6   BY MR. BARTHLE:

7       Q.   Yes, ma'am.

8       A.   Thank you.

9       Q.   Thank you.

10      A.   And who does this go to?

11      Q.   All right.  Have you ever been deposed

12  before?

13      A.   No.

14      Q.   All right.  I'm going to go over some rules

15  of the road then.  The first thing is you can see we

16  have a court reporter here writing down everything

17  that we say, so it's important that your answers are

18  verbal.  So if you just shake your head or say huh-uh

19  or uh-huh, that doesn't make for a very good record.

20  So clear yes, no, or explanations.  Is that -- is

21  that okay?

22      A.   That is fine.

23      Q.   Similarly, it's important that you wait

24  until I'm finished asking the question before you

**IN RE: FLAGSTAR DECEMBER 2021 DATA SECURITY INCIDENT LITIGATION**
Jennifer Charters on 01/09/2024

Page 8

```
 1   start your response because she can't write down what

 2   we're both saying at the same time.  And similarly, I

 3   will try to wait until you're finished answering

 4   before I start the next question.  Is that okay?

 5        A.   Understood, yes.

 6        Q.   You understand that your testimony could be

 7   for trial and played before a judge or a jury?

 8        A.   Yes.

 9        Q.   You understand that you've taken an oath to

10   provide truthful testimony just as if you were

11   testifying in court?

12        A.   Yes.

13        Q.   If I ask you a question that you don't

14   understand, feel free to ask me to rephrase.  If you

15   answer, I'm going to assume that you understood the

16   question.  Okay?

17        A.   Uh-huh.  Yes.

18        Q.   If you need a break, let me know.  We

19   usually take a break about every hour.  The only sort

20   of caveat to that is I ask that we not take a break

21   while a question is pending.  So just ask your

22   question, answer it, and then we can take a break.

23   All right?

24        A.   Okay.
```

**IN RE: FLAGSTAR DECEMBER 2021 DATA SECURITY INCIDENT LITIGATION**
Jennifer Charters on 01/09/2024

Page 9

1    Q.   Do you have any health conditions or are you

2    on any medication that might affect your ability to

3    testify today?

4    A.   No.

5    Q.   Anything else that would prevent you from

6    testifying completely and accurately today?

7    A.   No.

8    Q.   When I refer to Flagstar today, is it your

9    understanding or can we agree that that relates to

10   both defendants New York Community Bancorp, Inc. and

11   Flagstar Bank, N.A.?

12   A.   Yes, though I think it's important to

13   recognize the time period in which you may be

14   referencing those.  The merger between the two

15   companies occurred January -- or sorry, December 1st

16   of 2022 -- 2020- -- what's -- 2022.  So it's just

17   been over a year that we've been a combined entity.

18   Q.   What's your home address?

19   A.   753 Grace Street in Northville, Michigan.

20   Q.   And you're familiar with the -- the cyber

21   incident that Flagstar experienced on or around

22   December 3rd to 4th, 2021?

23   A.   Yes.

24   Q.   Is it okay today if we refer to that either

IN RE: FLAGSTAR DECEMBER 2021 DATA SECURITY INCIDENT LITIGATION
Jennifer Charters on 01/09/2024

Page 10

1  as "the incident" or "the breach" or "the data

2  breach"?

3      A.   Yes.

4      Q.   All right.  You'll understand that that's

5  what I'm referring to?

6      A.   Yes.

7      Q.   I'll show you what we'll mark as Exhibit 18.

8              (Whereupon, Deposition

9               Exhibit No. 18 was marked.)

10  BY MR. BARTHLE:

11     Q.   Have you ever seen that document before?

12     A.   Yes, I have.

13     Q.   And this is the notice of your deposition

14  for today, correct?

15     A.   That is correct.

16     Q.   What did you do to prepare for your

17  deposition today?

18     A.   I met with my attorneys yesterday, and we

19  did a quick briefing of what it would be like to be

20  deposed, and I reviewed some of the documents that

21  were related to the matter.  And that's about it.

22     Q.   Do you recall what documents you reviewed?

23          MS. LAPE:  Objection.  I'm going to instruct

24  you not to answer that question.  It calls for

**IN RE: FLAGSTAR DECEMBER 2021 DATA SECURITY INCIDENT LITIGATION**
**Jennifer Charters on 01/09/2024**

1    work -- attorney work product.

2            You can ask her if she recalls any

3    documents -- if she reviewed any documents that

4    refreshed her recollection.  That would be a proper

5    question.

6    BY MR. BARTHLE:

7        **Q.    Okay.  Did you review any documents that**

8    **refreshed your recollection?**

9        A.    I did.

10       **Q.    And what were those?**

11       A.    I reviewed the declaration.  I believe that

12   was from July that that was signed, so it's been

13   quite some time.  I reviewed -- there was a document

14   that described part of the incident, so I reviewed

15   that.  I looked back at some of the interaction with

16   the threat actor.  I did look at the ransom -- or I

17   guess basically a ransom note that they essentially

18   sent to us.  I did look at some of the data

19   associated with the individuals impacted.  And I

20   believe that -- that covers it.

21       **Q.    You mentioned a document that described the**

22   **incident.  What form was that in?  Was it a report or**

23   **an e-mail, or what was the form of this document?**

24       A.    I believe it was a Word document, but it was

**IN RE: FLAGSTAR DECEMBER 2021 DATA SECURITY INCIDENT LITIGATION**
Jennifer Charters on 01/09/2024

Page 12

1    a printed copy, so I did not have an electronic

2    version to know if -- what the format was.

3       Q.    And was this something that Flagstar

4    created?

5       A.    Yes.

6       Q.    Do you know who at Flagstar would have made

7    this?

8       A.    I don't know.

9       Q.    Do you know when it was created?

10      A.    I do not know.

11      Q.    Next you mentioned the interaction with the

12   threat actor.  What -- what form was that in?

13      A.    It was a paper form, but it was of e-mail

14   exchanged.

15      Q.    Was it -- did it consist of a Gmail e-mail

16   exchange?

17      A.    It did.

18      Q.    The ransom note, was that a paper copy as

19   well?

20      A.    It was.

21      Q.    Do you know what that paper copy originally

22   derived from?

23      A.    It was a fax.

24      Q.    And then the data associated with the

**IN RE: FLAGSTAR DECEMBER 2021 DATA SECURITY INCIDENT LITIGATION**
Jennifer Charters on 01/09/2024

Page 13

1    impacted individuals, what -- what form was that in?

2        A.   It was -- what I looked at was paper, but it

3    was from an Excel document.

4        Q.   I think we'll probably get to that piece

5    later.  But was that something that Flagstar created?

6        A.   Yes.

7        Q.   Were you involved in its creation?

8        A.   I was not involved in its creation.

9        Q.   Do you know when it was made?

10       A.   It was made likely around March of 2021.

11       Q.   Other than conversations with your lawyers,

12   did you meet with anyone in preparation for your

13   depo?

14       A.   No.

15       Q.   Did you bring any notes or documents with

16   you today?

17       A.   No.

18       Q.   Did you review any other deposition

19   transcripts from this case?

20       A.   No.

21       Q.   All right.  I'm going to hand you what we'll

22   mark as Exhibit 19.

23

24

**IN RE: FLAGSTAR DECEMBER 2021 DATA SECURITY INCIDENT LITIGATION**
Jennifer Charters on 01/09/2024

Page 14

```
 1                    (Whereupon, Deposition

 2                     Exhibit No. 19 was marked.)

 3    BY MR. BARTHLE:

 4        Q.   Are you familiar with this document?

 5        A.   Yes, I am.

 6        Q.   And what is it?

 7        A.   It is a declaration that I signed in regard

 8    to this matter.

 9        Q.   Are you aware it was submitted in connection

10    with Flagstar's Motion to Dismiss that was filed in

11    this case?

12        A.   Yes, I am aware.

13        Q.   And does this appear to be a true and

14    accurate copy of the declaration that you submitted?

15        A.   It appears to be accurate, yes.

16        Q.   Have you submitted declarations in a legal

17    proceeding before?

18        A.   No.

19        Q.   Can you tell me who drafted what's now

20    marked as Exhibit 19?

21        A.   I don't know who drafted it.  I know that it

22    was provided to me by my legal counsel.

23        Q.   So you didn't prepare this yourself?

24        A.   I did not.
```

**IN RE: FLAGSTAR DECEMBER 2021 DATA SECURITY INCIDENT LITIGATION**
Jennifer Charters on 01/09/2024

Page 15

1      Q.    Do you know when preparation of this

2   declaration began?

3      A.    I do not.

4      Q.    Do you know whether whoever prepared this

5   spoke with anyone inside of Flagstar about its

6   content?

7      A.    I do not know.  I would have to speculate

8   because the information that is contained within it

9   is information from Flagstar.

10      Q.    Do you know whether whoever prepared this

11   declaration would have spoken with folks outside of

12   Flagstar?

13      A.    I do not know.

14      Q.    So understanding that it was prepared by

15   someone else and it -- it came to you, was there any

16   sort of iterations or revisions that took place?

17      A.    No.  Not after I saw it, anyway.

18      Q.    So it came to you as just a complete whole

19   and -- and you reviewed and signed it?

20      A.    Yes.

21      Q.    So there were -- at least from your

22   perspective, there weren't any prior drafts that you

23   reviewed?

24      A.    No.

Page 16

1      Q.    I guess in -- in connection with executing

2   this declaration, did you review or consider any

3   documents?

4      A.    Yes.

5      Q.    And what were those?

6      A.    The data related to the individuals who were

7   identified to confirm that indeed, you know, the

8   statements that were in the declaration were true.

9      Q.    I'm going to show you what we'll mark as

10   Exhibit 20.

11                    (Whereupon, Deposition

12                     Exhibit No. 20 was marked.)

13   BY MR. BARTHLE:

14      Q.    And I apologize for the miniscule size, but

15   that is how it came to us.

16            MS. LAPE:  This doesn't have -- it doesn't

17   appear to have a Bates stamp on it.

18            MR. BARTHLE:  My understanding, when we

19   printed it, this is how it printed.

20            MS. LAPE:  Do you know what Bates stamp is

21   associated with this document?

22            MS. KANE:  (Nodding.)

23            MR. BARTHLE:  It should be FLAG-DEC-00000087

24   to 88.

**IN RE: FLAGSTAR DECEMBER 2021 DATA SECURITY INCIDENT LITIGATION**
Jennifer Charters on 01/09/2024

1   BY MR. BARTHLE:

2       Q.   Are you familiar with this document?

3       A.   Yes.

4       Q.   And was this what you just testified to

5   having reviewed in connection with executing the

6   declaration?

7       A.   Yes.

8       Q.   And this was the only documents that you

9   reviewed in connection with preparation, execution of

10  the declaration?

11      A.   Yes.

12      Q.   What is this Exhibit 20?

13      A.   It is an excerpt of the data that was

14  provided by the Flagstar team in connection with

15  individual data impacted, exfiltrated by a threat

16  actor.

17      Q.   And -- and you said it's an excerpt of data

18  provided by the Flagstar team.  Who's the Flagstar

19  team?

20      A.   The Flagstar data analytics group in fact

21  produced this based off of information that they had

22  from our data forensics provider, and so we added

23  additional data to the file so that we could make

24  contact with individuals who were on that list.

**IN RE: FLAGSTAR DECEMBER 2021 DATA SECURITY INCIDENT LITIGATION**
Jennifer Charters on 01/09/2024

Page 18

1     Q.   All right.  Who in the -- is in the Flagstar

2  data analytics team that prepared this document?

3     A.   One of the individuals, the primary

4  individual was Kamala S, I'm going to say,

5  Srigiriraju.  We can get the accurate pronunciation

6  and spelling of that last name for you.  But Kamala

7  is one of our data architects within the Flagstar IT

8  organization and was a primary in terms of producing

9  this.  Another individual who was involved is Jeremy

10  Feen.  That's F E E N.  And overseeing all of it is

11  Greg Hubble who is our chief data officer within IT.

12     Q.   Do you know how this document, these two

13  pages, were created?

14     A.   We have a data warehouse that has all of our

15  customer data contained within it, and we mapped key

16  elements that we had against our data warehouse to

17  produce things like address so that we could send a

18  mailing to the individuals with credit monitoring.

19     Q.   And -- and how did you become informed about

20  how this document was created?

21          MS. LAPE:  Patrick, just so we're clear, you

22  know, we represented to you and we produced this

23  document that this was an excerpt of the data that

24  represented the plaintiffs involved in this case.

**IN RE: FLAGSTAR DECEMBER 2021 DATA SECURITY INCIDENT LITIGATION**
Jennifer Charters on 01/09/2024

Page 19

1 And so I think there's a little confusion here with

2 respect to the questions about whether you're talking

3 about the full list of people who were -- who were

4 subject to the breach or whether you're just talking

5 about this specific excerpt that was created for this

6 litigation.  So maybe we can just clarify that in the

7 questions.

8          MR. BARTHLE:  Sure.

9 BY MR. BARTHLE:

10     Q.   Yeah.  I'm talking about the -- the --

11 whatever source this was drawn from.  Okay?

12     A.   Uh-huh, the master list.

13     Q.   Right.

14     A.   Yeah.

15     Q.   So it's my understanding that the data

16 analytics team, using the data warehouse, matched

17 certain -- well, let me ask.  Let me strike that.

18          You mentioned a data forensic vendor earlier

19 in your answer.  Do you recall that?

20     A.   Yes, I do.

21     Q.   Who was that?

22     A.   Kroll.

23     Q.   What do they do?

24     A.   Kroll as a data forensics provider received

**IN RE: FLAGSTAR DECEMBER 2021 DATA SECURITY INCIDENT LITIGATION**
Jennifer Charters on 01/09/2024

Page 20

1   the data that was breached, and they go through and

2   identify, either automatically or manually, what PII

3   data, personally identifiable information, may be

4   contained within a file.  We give them some

5   information around, what does an account number, for

6   example, look like?  And they match against it where

7   they can.

8        Q.   And how is it determined what the breached

9   data was that Kroll received?

10       A.   We were able to pull the data out of our

11  environment.  We had logs from our servers that

12  contained which files were extracted, and we were

13  able to identify those files and send them to Kroll.

14       Q.   Who was involved in that analysis of the --

15  of the logs?

16       A.   I don't know all the people who were

17  involved, but it was predominantly our information

18  security team.

19       Q.   You weren't involved personally in that

20  process?

21       A.   I was not.

22       Q.   If you're trying to determine who would have

23  been involved in that process, who would you go to

24  first?

**IN RE: FLAGSTAR DECEMBER 2021 DATA SECURITY INCIDENT LITIGATION**
Jennifer Charters on 01/09/2024

Page 21

1    A.    I would have gone to the CISO who at the

2   time was responsible for overseeing the information

3   security team.

4    **Q.    And who was that?**

5    A.    Zah Gonzalvo.

6    **Q.    Is he still employed by Flagstar?**

7    A.    She is no longer employed by Flagstar.

8    **Q.    Who's the CISO today?**

9    A.    John Gambardella.

10    **Q.    All right.  So let's see if I understand how**

11   **this -- well, the -- the list from which this**

12   **document was drawn was created.  Kroll got the --**

13   **sort of the universe of breached data.  They**

14   **determined the individuals associated with it?**

15    A.    They looked at the data to try to identify

16   any individuals who were impacted with the PII or the

17   personally identifiable information key fields.

18    **Q.    And then at some point the Flagstar data**

19   **analytics team gets involved, correct?**

20    A.    Correct.

21    **Q.    And what -- what -- what are they doing with**

22   **respect to this --**

23    A.    Yeah.

24    **Q.    -- list?**

**IN RE: FLAGSTAR DECEMBER 2021 DATA SECURITY INCIDENT LITIGATION**
Jennifer Charters on 01/09/2024

Page 22

 1    A.   So Kroll had to first produce for us a list

 2    of impacted individuals, including the elements that

 3    were impacted.  Then our team took that list and

 4    mapped it against our data warehouse to identify

 5    addresses, confirm that they were individuals who

 6    were part of our -- our data warehouse.  It's

 7    possible someone may not have been within the data

 8    warehouse at all.  And then we would identify

 9    addresses.

10    Q.   So Kroll got the universe of breached data

11    and identified the PII within it, figured out who the

12    individuals were with -- with impacted PII and what

13    the data elements for those individuals were,

14    correct?

15    A.   I'm sorry.  Can you repeat it?  I just want

16    to make sure I'm answering the right question.

17    Q.   So Kroll got the universe of -- of --

18    A.   Yeah.

19    Q.   -- breached data, right?

20    A.   Yep.

21    Q.   Then they identified PII elements within it,

22    correct?

23    A.   Correct.

24    Q.   Then they figured out what individuals that

Page 23

1    PII related to?

2        A.   Correct.

3        Q.   And they figured out what all data

4    elements -- PII data elements were in that universe

5    of data for those individuals?

6        A.   Correct.

7        Q.   Then that list of -- of impacted individuals

8    then goes to the Flagstar data analytics team, right?

9        A.   Correct.

10       Q.   And the -- and the data analytics team then

11   runs it through the data warehouse to find addresses

12   essentially?

13       A.   Correct.

14       Q.   And the team that determined the scope of

15   the -- of the breached data was the information --

16   Flagstar's information security team, right?

17       A.   The scope of the breached data meaning the

18   data that left the environment that the threat actor

19   may have had access to, correct.

20       Q.   Correct.

21       A.   Yes.

22       Q.   Are you familiar with -- with what each of

23   these columns mean?

24       A.   I am familiar with most of the columns, yes.

IN RE: FLAGSTAR DECEMBER 2021 DATA SECURITY INCIDENT LITIGATION
Jennifer Charters on 01/09/2024

Page 24

1      Q.   So on -- in the first page here of

2   Exhibit 20, the far left column, Unique ID, is -- is

3   that a Flagstar identifier or what is that?

4      A.   That is probably one column I am not a

5   hundred percent sure of, and I'm having a hard time

6   reading it on this form.  I'm sorry.

7      Q.   Yeah.  And then on the -- on the second

8   page, there's a similar column, Unique ID, but it

9   references a Phase 1 and a Phase 2.  Do you have any

10  idea what that is?

11     A.   It was -- we received some of the data in --

12  I guess I'll say groups, so batches.  That's likely

13  what that is related to, but I'm somewhat speculating

14  on that.

15     Q.   All right.  On the -- on the first page, the

16  third column from the left, it says AGG exposed

17  elements.  Do you see that?

18     A.   I'm sorry.  Which page --

19     Q.   I'm sorry.

20     A.   -- am I looking at?

21     Q.   First page of Exhibit 20.

22     A.   Okay.

23     Q.   The third column from the right.

24     A.   Third column -- okay, from the right.

Page 25

1    Q.    Yeah.  I messed that up.

2          It says AGG_exposed_elements.  Do you see

3    that?

4    A.    Yes.

5    Q.    What is that referring to?

6    A.    Those are the -- the -- you know, as I

7    referenced, PII elements that were potentially

8    exposed.  They were part of the exfiltrated data.

9    Q.    And that's in the December of 2021 related

10   incident, correct?

11   A.    Correct.  I'm trying to recall -- I -- I

12   don't recall which list -- I don't have the dates on

13   here or I don't see dates on here as to whether this

14   was December 2021.  It does not specifically say

15   here.

16          MS. LAPE:  So I -- I can represent that the

17   document that's Bates-stamped ending in 87 relates to

18   the December 2021 breach.  And the next page which

19   ends in Bates stamp 88 relates to the Accellion

20   breach.

21          THE WITNESS:  Thank you.

22   BY MR. BARTHLE:

23   Q.    So that process we just described about how

24   this list was created would apply to the -- to the

Page 26

1   first page of Exhibit 20, correct?

2       A.   Correct.

3       Q.   Can you explain to me how the list on the

4   second page of Exhibit 20, which counsel just

5   represented relates to the Accellion breach, how was

6   it created?

7       A.   It was much the same process.  So we had the

8   data forensics provider look through the data,

9   identify any particular data elements of -- that were

10  important PII type data and then that was sent back

11  to the data warehouse team who went through

12  essentially the same process.

13      Q.   And for -- in both instances -- well,

14  scratch that.

15           For purposes of the -- of the December 2021

16  breach list, the first page of Exhibit 20, it's true

17  you weren't personally involved in the sort of log

18  analysis to determine the breached information or

19  potentially breached information, correct?

20      A.   That is correct.

21      Q.   And you weren't personally involved in

22  Kroll's analysis to determine the -- the individuals

23  and the -- and the information that was impacted for

24  those individuals?

IN RE: FLAGSTAR DECEMBER 2021 DATA SECURITY INCIDENT LITIGATION
Jennifer Charters on 01/09/2024

Page 27

```
 1      A.   That's correct.

 2      Q.   And you also weren't involved in the

 3   Flagstar data analytics team's data warehouse

 4   process, correct?

 5      A.   Correct.

 6      Q.   All right.  Other than these two pages --

 7   well, scratch that.

 8           Other than the two lists as we've discussed

 9   them, was there anything else that you reviewed or

10   considered at the time you were preparing, executing

11   your declaration?

12      A.   I used my recollection of the events that I

13   participated in related to the incident that was

14   described.

15      Q.   All right.  If you go back to Exhibit 19,

16   your declaration, at paragraph 13, the last

17   paragraph, you declare under penalty of perjury that

18   everything in it is true and correct.  Do you see

19   that?

20      A.   I do.

21      Q.   Does that remain the case today?

22      A.   Yes.

23      Q.   Is there anything in here you need to amend

24   or change?
```

Page 28

```
 1       A.   No.
 2       Q.   To the extent you had any questions when you
 3   reviewed this declaration -- well, let me back up.
 4            Was there anything in the declaration that
 5   you had questions about before you executed it?
 6       A.   I wanted to make sure that the names
 7   represented names that were in our file.
 8       Q.   And how did you go about ensuring the
 9   accuracy of those?
10       A.   Looking at the master data record.
11       Q.   And there was nothing else that you needed
12   to check on or -- or confirm?
13       A.   I don't recall there being anything else.
14   Most of what I see in here is very straightforward
15   and what I recall from the incident.
16       Q.   All right.  I want to direct your attention
17   to paragraphs 3 and 4 of the declaration, which is
18   Exhibit 19.
19            Paragraph 3 states, On December 3 and 4,
20   2021, Flagstar experienced a cyber incident involving
21   unauthorized access to its network by a threat actor.
22   During that time, the threat actor exfiltrated
23   certain data from Flagstar's network, the cyber
24   incident.
```

IN RE: FLAGSTAR DECEMBER 2021 DATA SECURITY INCIDENT LITIGATION
Jennifer Charters on 01/09/2024

Page 29

1          Did I read that correctly?

2     A.   Yes, you did.

3     Q.   Does that -- that timeline, does that remain

4  your understanding of what happened in this case?

5     A.   On December 3rd and 4th, we had data

6  exfiltrated from the Flagstar environment, correct.

7     Q.   Do you know whether the incident started

8  prior to December 3rd?

9     A.   It did.

10    Q.   And -- and when did it start?

11    A.   I don't recall the exact date, but it was in

12  November, late November.

13    Q.   November 22nd, 2021, does that sound about

14  right?

15    A.   That sounds about right.

16    Q.   Do you know whether the attacks related to

17  this incident persisted after December 4th?

18    A.   They did.

19    Q.   And -- and what were those attacks that

20  occurred after?

21    A.   There were, for example, DDOS attacks that

22  continued beyond December 3rd and 4th.  There was

23  ransomware that was deployed on December 13th.

24    Q.   So in paragraph 3 when -- when you

IN RE: FLAGSTAR DECEMBER 2021 DATA SECURITY INCIDENT LITIGATION
Jennifer Charters on 01/09/2024

1  referenced December 3rd and 4th, that's just

2  referencing when actual exfiltration occurred?

3      A.   That is correct.

4      Q.   And what is the -- the basis for your

5  understanding that those are the -- the two days

6  where it occurred?

7      A.   We had a -- I'll say a postmortem after the

8  event, and we went through and reviewed all of the

9  various -- I guess I'll say highlights of the event,

10  and this was specifically where the logs show that

11  data was exfiltrated out of the environment.

12      Q.   And that log analysis, was -- was that the

13  same log analysis that was done related to the --

14  Exhibit 20 by the information security team?

15      A.   That is correct.  I want to just clarify.

16  We had assistance from external vendor Kroll as well

17  who did forensics analysis of our environment, so

18  that was led by our information security team with

19  participation and also support from Kroll.

20      Q.   All right.  So you testified that your

21  understanding about exfiltration occurring on

22  December 3rd and 4th was from a postmortem after this

23  analysis.  What was the form of that postmortem?

24      A.   Can you elaborate what you mean by "form"?

IN RE: FLAGSTAR DECEMBER 2021 DATA SECURITY INCIDENT LITIGATION
Jennifer Charters on 01/09/2024

Page 31

1    Q.   Is there a report?  Was it a meeting, an

2    e-mail?  How did you come to understand that it was

3    only December 3rd and 4th?

4    A.   There was a report that was produced.  Kroll

5    did their forensics analysis.  And there were also

6    meetings where we discussed what occurred.

7         MS. LAPE:  And I'm going to caution you that

8    to the extent these meetings involved legal counsel,

9    I want to make sure that you don't disclose anything

10   that's protected by the attorney-client privilege.

11   So just keep that in mind as he's ans- -- asking

12   these questions, please.

13        THE WITNESS:  Okay.

14   BY MR. BARTHLE:

15   Q.   That report from Kroll, it was a written

16   report?

17   A.   Yes.

18   Q.   Do you recall approximately when that was

19   received?

20   A.   I do not recall when it was received, but it

21   was likely sometime January, February, following the

22   event.

23   Q.   What was your personal role in discovering

24   or responding to this cyber incident?

**IN RE: FLAGSTAR DECEMBER 2021 DATA SECURITY INCIDENT LITIGATION**
Jennifer Charters on 01/09/2024

Page 32

 1      A.   As the chief information officer, I oversee

 2   the operations of the IT environment.  And if there

 3   are incidents that occur, I need to make sure that

 4   I'm aware so that we can make sure that our

 5   operations can continue.

 6      **Q.   So, I mean, specifically in this instance, I**

 7   **guess exfiltration happens on the 3rd -- on the 3rd**

 8   **and the 4th.  When did you become aware of that?**

 9      A.   I didn't become aware -- I knew that there

10   was an incident as it was -- shortly after it

11   occurred, once we were aware of what happened.  So I

12   was very connected with the information security

13   team, with the CISO, who was essentially on point for

14   working with our forensics vendors, managed detection

15   response vendors, and I can't tell you exactly when I

16   knew the data was exfiltrated but was -- it was very

17   shortly after it occurred.

18      **Q.   Did you -- did you have any personal role in**

19   **the response other than overseeing the folks who were**

20   **doing it?**

21      A.   I was engaged with the IT team to take

22   remediation steps where needed based off of feedback

23   that we were getting from the information security

24   team and Kroll.

IN RE: FLAGSTAR DECEMBER 2021 DATA SECURITY INCIDENT LITIGATION
Jennifer Charters on 01/09/2024

Page 33

1     Q.   Are you familiar with who the threat actor

2   was?

3     A.   Yes.

4     Q.   And who was it?

5     A.   Shao, I believe was the name of the group.

6     Q.   And how did you come to that understanding?

7     A.   I learned of it through the information

8   security team.

9     Q.   And that was Zag at that time?

10    A.   Zah.

11    Q.   Can you spell that?

12    A.   Sure.  Z A H.  Zahira is the full name,

13   Z A H I R A.

14    Q.   So would you just get reports from Zah about

15   who it was and how it happened and whatnot?

16    A.   We actually had meetings, regular meetings.

17   So not just a report.  We had an incident response

18   plan that we follow.  And that involved a number of

19   different executives who were made aware of the

20   incident and our therefor response to it.

21    Q.   And who was present at these meetings?

22    A.   I will recall to the best of my ability who

23   was there.  So the chief risk officer -- do you want

24   name?

IN RE: FLAGSTAR DECEMBER 2021 DATA SECURITY INCIDENT LITIGATION
Jennifer Charters on 01/09/2024

Page 34

1      Q.    Sure.

2      A.    Okay.  That was Steven Figliuolo.  Good luck

3   spelling that one.  He was there.  Our chief

4   information security officer, Zah that I mentioned.

5   We had a crisis management individual who was often

6   involved in these meetings, Laheeb Betti.  We had

7   our -- basically the executive team which was made up

8   of Sandro DiNello who was the CEO.  We had Lee Smith,

9   president of mortgage.  Jim Ciroli, the chief

10  financial officer.  Chief HR officer.  At the time I

11  believe it was David Hollis.  There was a change

12  in -- one individual retired, so I believe it was

13  David who was there.  I'm trying to think if I'm

14  missing anyone.  Reggie Davis, president of banking.

15  Paul Borja, general counsel.  And I believe that

16  covers most of the participants.

17     Q.    These are physical meetings or Zoom or both?

18     A.    We were predominantly remote at the time, so

19  this was Webex.

20     Q.    And was it the CISO that was reporting

21  during these meetings about what was happening?

22     A.    Yes, mostly, yes.

23     Q.    Back to your declaration, Exhibit 19,

24  paragraph 4, it states that, Following a cyber

**IN RE: FLAGSTAR DECEMBER 2021 DATA SECURITY INCIDENT LITIGATION**
Jennifer Charters on 01/09/2024

Page 35

1  incident, Flagstar received ransom demands from the

2  threat actor.

3          Do you see that?

4      A.  I do.

5      Q.  Did you personally receive those ransom

6  demands?

7      A.  I did not.

8      Q.  Okay.  How were they received?

9      A.  There was a fax that was sent, and the fax

10  was distributed, I believe, somewhat randomly.  I

11  also understand that Sandro DiNello, CEO of the bank

12  at the time, received an e-mail.

13     Q.  So at least as far as you're aware, there

14  was a sort of broadly distributed fax and then an

15  e-mail to the CEO; is that correct?

16     A.  Correct.

17     Q.  I'll show you what we'll mark as -- as

18  Exhibit 21.

19                  (Whereupon, Deposition

20                   Exhibit No. 21 was marked.)

21  BY MR. BARTHLE:

22     Q.  Have you seen this before?

23     A.  I have.

24     Q.  What is it?

IN RE: FLAGSTAR DECEMBER 2021 DATA SECURITY INCIDENT LITIGATION
Jennifer Charters on 01/09/2024

Page 36

1    A.   This is the fax that I referenced that we

2    received.

3    **Q.   And I think earlier when you were**

4    **referencing the documents that you reviewed prior to**

5    **the deposition, you referenced the ransom note.  Was**

6    **it this one?**

7    A.   No.

8    **Q.   What was the one that you reviewed in**

9    **preparation for today?**

10   A.   My apologies.  I'm going to go back on that.

11   I was thinking that you said in -- as I put the

12   dep- -- or sorry -- the declaration together.  You're

13   asking -- and I just want to make sure I'm clear on

14   this.  You're asking what I did to prepare for the

15   deposition?

16   **Q.   Correct.**

17   A.   Got it.  So yes, I did see this before.

18   **Q.   And this is -- again, you said there was a**

19   **fax and there was an e-mail.  This is the fax,**

20   **correct?**

21   A.   This is the fax, correct.

22   **Q.   And it went -- do you know who all it went**

23   **to?**

24   A.   No.  I mean, it went to fax machines in some

**IN RE: FLAGSTAR DECEMBER 2021 DATA SECURITY INCIDENT LITIGATION**
**Jennifer Charters on 01/09/2024**

1   cases.  Believe it or not, they still exist.  And in

2   other cases, I'm sure they probably went to a -- sort

3   of a group fax in more electronic form.

4        Q.   How did you first come to see this?

5        A.   It was sent to -- basically I believe it

6   arrived at the information security teams desk at

7   some point.  I don't know how I came across it other

8   than it was likely shared in one of these meetings.

9   So while I did not receive it directly, as part of

10  the crisis management team, this was part of the

11  material that we -- we saw and that we were managing

12  the risk around.

13       Q.   Was there just one version of this fax that

14  just went to a bunch of places, or were there

15  multiple versions?

16       A.   I am only aware of one version.

17       Q.   Have you seen the e-mail to the CEO?

18       A.   Yes, I have.

19       Q.   Is it substantively identical or...

20       A.   No.

21       Q.   How is it different, if you recall?

22       A.   If I recall, it was much briefer.  And it

23  was really a true ransom, if I recall, where they

24  were asking for money.

Page 38

1      Q.   Do you recall what day this was received on?

2      A.   I do not.

3      Q.   Again, looking at Exhibit 21, ransom fax.

4   It starts, Hello again.  Do you see that?

5      A.   I do.

6      Q.   Any sense of why the attacker said "again"?

7      A.   I do not.

8      Q.   Do you know whether this group had attacked

9   Flagstar before?

10     A.   They have never attacked Flagstar that I am

11  aware of.

12     Q.   All right.  Turning back to your

13  declaration, paragraph 4 still, the second sentence,

14  you write, After negotiations with the threat actor,

15  which were facilitated by a professional ransomware

16  negotiator, Flagstar and the threat actor agreed that

17  Flagstar would pay 1 million in exchange for, among

18  other things, the complete deletion of all data

19  acquired by the threat actor from Flagstar's network.

20          Do you see that?

21     A.   I do.

22     Q.   Did I read that correctly?

23     A.   You did.

24     Q.   Who was the professional ransomware

Page 39

1  negotiator referred to here?

2      A.   The firm we used was Tetra Defense.

3      Q.   **Were you involved in the decision to use**

4  **Tetra?**

5      A.   No.

6      Q.   **Why not?**

7      A.   That was not part of my authority to make

8  that decision.

9      Q.   **Who was involved in the decision?**

10      A.   The -- we worked with our insurance provider

11  who had provided us a breach coach who helps with

12  kind of the management of a breach overall, and they,

13  I believe, have used Tetra Defense in the past and

14  recommended them as a negotiator, not a vendor that

15  we typically have on hand.

16      Q.   **Who from Flagstar would have been involved**

17  **in -- in agreeing to use Tetra?**

18      A.   It was likely the -- I guess I'll say the

19  legal team who was responsible for coordinating our

20  insurance.

21      Q.   **Okay.  And given that you weren't directly**

22  **involved in this, how did you become aware about**

23  **Tetra's involvement in the negotiation?**

24      A.   I mentioned the meetings that we had.  We

**IN RE: FLAGSTAR DECEMBER 2021 DATA SECURITY INCIDENT LITIGATION**
Jennifer Charters on 01/09/2024

Page 40

1  met almost daily and followed the -- the progress of

2  the various events, the negotiations, and so forth.

3      **Q.   Do you -- do you recall who would have been**

4  **reporting on that piece of the -- of the response?**

5      A.   I believe that it was our breach counsel.

6      **Q.   Do you know why Flagstar decided to use just**

7  **a third party generally for the negotiation?**

8      A.   Yes.  It is not our expertise.

9      **Q.   I think you testified to this earlier, but**

10  **the reason Tetra was used was they were recommended**

11  **by the breach coach?**

12      A.   And insurance provider.

13      **Q.   Did you have any personal involvement in the**

14  **discussions between Tetra and the threat actor?**

15      A.   No.

16      **Q.   Why not?**

17      A.   Repeat the question.  Why didn't I have

18  involvement in the discussions between Tetra and the

19  threat actor?

20      **Q.   Correct.**

21          MS. LAPE:  Objection, vague.

22          You can --

23          Calls for speculation.

24          You can answer the question if you're able

IN RE: FLAGSTAR DECEMBER 2021 DATA SECURITY INCIDENT LITIGATION
Jennifer Charters on 01/09/2024

Page 41

```
 1    to.

 2            THE WITNESS:  It wasn't my expertise to

 3    contribute to that conversation.  I just was not

 4    involved in it.  It was not my role.

 5    BY MR. BARTHLE:

 6        Q.   And again -- well, let me back up.

 7             Given you weren't involved because it wasn't

 8    your sort of bailiwick, how did you become informed

 9    about what happened in those negotiations, through

10    the executive meetings?

11        A.   Correct.

12        Q.   Do you know who -- what like individual or

13    individuals at Tetra was responsible for the

14    negotiations with the threat actor?

15        A.   I do not.

16        Q.   Do you know what form those negotiations

17    took?

18        A.   The form was e-mail.

19        Q.   Exclusively e-mail?

20        A.   I am aware of e-mail.  There -- in the

21    e-mails, there is mention of a call.  I am not aware

22    of whether there was actual discussion or not.

23            MR. BARTHLE:  We're right at an hour.  Do

24    you want to take a break, or do you want to keep
```

**IN RE: FLAGSTAR DECEMBER 2021 DATA SECURITY INCIDENT LITIGATION**
Jennifer Charters on 01/09/2024

Page 42

```
 1   going?

 2            MS. LAPE:  Take a quick five-minute break?

 3            MR. BARTHLE:  Sure.

 4            THE WITNESS:  Sure.  That's fine.

 5            THE VIDEOGRAPHER:  We are going off the

 6   record at 11:38 a.m.

 7                      (Whereupon, a break was taken,

 8                       after which the following

 9                       proceedings were had:)

10            THE VIDEOGRAPHER:  We are going back on the

11   record at 11:50 a.m.

12   BY MR. BARTHLE:

13       Q.   Ms. Charters, earlier in your testimony, you

14   referenced a managed detection response vendor.  Do

15   you recall that?

16       A.   I do.

17       Q.   Who was that?

18       A.   Kroll.

19       Q.   Were there any other -- you've referenced

20   Kroll and Tetra.  Were there any other vendors

21   involved in this incident?

22       A.   We did -- during remediation, we did look at

23   the vendors who were involved in the various systems,

24   so, for example, Citrix.  We engaged them to help
```

**IN RE: FLAGSTAR DECEMBER 2021 DATA SECURITY INCIDENT LITIGATION**
**Jennifer Charters on 01/09/2024**

Page 43

1   with any kind of remediation.  But during the actual

2   incident itself, it was somewhat limited.  There was

3   a -- another firm that was involved.  I believe they

4   were FTI, but that was more for helping us with

5   communications.

6       Q.   Communications with whom?

7       A.   With customers, with -- predominantly it was

8   with customers, but also there were some internal

9   talking points as well.  So if you were a customer

10  call center agent who was interfacing with a customer

11  and the customer is asking, you know, what's going

12  on, they provided, you know, FAQs and other things

13  to -- to help them.

14      Q.   You also referenced a breach coach.  Do you

15  recall that?

16      A.   I do.

17      Q.   Who was that?

18      A.   McDonald Hopkins was the -- the firm.

19      Q.   Was McDonald Hopkins also the breach counsel

20  you referred to?

21      A.   They were.

22      Q.   So was the coach somebody specific at

23  McDonald Hopkins or just the firm generally?

24      A.   It was a specific individual.  I remember

IN RE: FLAGSTAR DECEMBER 2021 DATA SECURITY INCIDENT LITIGATION
Jennifer Charters on 01/09/2024

Page 44

1   the first name is Jim.  I cannot remember the last

2   name at the moment.

3       **Q.   The ransom note fax, Exhibit 21, was this**

4   **exchanged during these incident response meetings,**

5   **the physical demand?**

6       A.   We did see copies of this -- I -- I'm trying

7   to recall if there was any demand in this one.  I

8   don't believe that the demand was here so much as

9   what they were telling us to do or not do.

10      **Q.   Were other materials exchanged during those**

11  **meetings?**

12      A.   There were various materials that were

13  exchanged during the meeting.

14      **Q.   And -- and what were those?**

15      A.   I will not be able to recall all materials

16  that were potentially exchanged.

17          MS. LAPE:  And I'm just going to caution you

18  briefly.  I know you mentioned earlier that the

19  general counsel was present in these meetings.  I

20  don't know whether McDonald Hopkins was also present,

21  but we -- I just want you to be cautious to not

22  reveal anything that's protected by the

23  attorney-client privilege as you're answering these

24  questions.

**IN RE: FLAGSTAR DECEMBER 2021 DATA SECURITY INCIDENT LITIGATION**
Jennifer Charters on 01/09/2024

Page 45

```
 1              THE WITNESS:  Okay.

 2              I mean, the predominant purpose behind the

 3    meetings was to discuss the events as well as impact

 4    to the business and customers and to make sure that

 5    we were addressing things, for example, with our

 6    regulators, with our board of directors, and anyone

 7    else that we needed to notify, which may have

 8    included law enforcement.

 9              And so when I talk about, you know, what

10    materials, certainly we had the ransom note.  We had

11    information around -- from the cyber team, from the

12    information security team.  Those are the main things

13    that I recall.

14    BY MR. BARTHLE:

15        Q.   Okay.  Before the break, we were talking

16    about the negotiations with the threat actor.  Do you

17    recall that?

18        A.   I do.

19        Q.   I believe you testified that they were

20    primarily, perhaps exclusively, by e-mail; is that

21    right?

22        A.   That's right.  I -- I did mention

23    predominantly e-mail.

24        Q.   All right.  I'm going to show you what was
```

IN RE: FLAGSTAR DECEMBER 2021 DATA SECURITY INCIDENT LITIGATION
Jennifer Charters on 01/09/2024

Page 46

```
 1    previously marked as Exhibit 12.

 2              MS. LAPE:   Thank you.

 3    BY MR. BARTHLE:

 4        Q.    Have you seen this before?

 5        A.    I have.

 6        Q.    And what is it?

 7        A.    This is an exchange of e-mails between Tetra

 8    Defense and the threat actor.

 9        Q.    And I think you testified earlier, but you

10    had no involvement in these communications, direct

11    personal involvement, correct?

12        A.    Correct.

13        Q.    Have you reviewed these before?

14        A.    I have.

15        Q.    When?

16        A.    In preparation for today.  I also saw

17    excerpts of them that were sent to us throughout the

18    incident.

19        Q.    Did you review these prior to executing your

20    declaration?

21        A.    No.

22        Q.    Well, I want to ask if this appears to be a

23    true and correct copy, but I don't think you would

24    know, right?
```

**IN RE: FLAGSTAR DECEMBER 2021 DATA SECURITY INCIDENT LITIGATION**
**Jennifer Charters on 01/09/2024**

Page 47

1      A.   I think that's accurate.  Fully compiled, I

2  would not know.

3      Q.   All right.  I -- I do want to point you to

4  one thing.  The very first e-mail here, it's dated

5  December 13th, 2021.  Do you see that?

6      A.   Uh-huh.  I do.

7      Q.   It says, Hello, we received e-mails and

8  calls from you.  Our e-mail is down right now, so we

9  can't reply.  I made this e-mail to talk to you.

10  What do you want from us?

11          Do you see that?

12      A.   I do.

13      Q.   Did I read that correctly?

14      A.   You did.

15      Q.   Was Flagstar's e-mail down on December 13th,

16  2021?

17      A.   Not all e-mail was down.  There were some

18  individuals within the bank whose e-mail was down.

19      Q.   And what was the cause of that?

20      A.   It was the ransomware and the encryption

21  deployed.

22      Q.   And this is nine, ten days after the

23  exfiltration on December 3rd and 4th, correct?

24      A.   That is correct.

IN RE: FLAGSTAR DECEMBER 2021 DATA SECURITY INCIDENT LITIGATION
Jennifer Charters on 01/09/2024

Page 48

1    Q.    The ransomware was deployed when?

2    A.    December 13th.

3          MS. LAPE:  And, Patrick, I just want to note

4    that there are not facts in her declaration that talk

5    about the ransomware deployment, and so I do believe

6    we are exceeding the scope of what we've agreed upon

7    for purposes of this deposition.  Some general

8    questions, I've -- I've allowed, but I would

9    appreciate if we would stick within the bounds of

10   what we agreed upon on December 5th.

11         MR. BARTHLE:  Well, the first we heard that

12   the ransomware was deployed on December 13th was

13   today, and it came from her.  So I'm just following

14   up on what she's --

15         MS. LAPE:  It did.

16         MR. BARTHLE:  -- testified to.

17         MS. LAPE:  And as I've said, I've -- I've

18   allowed some general questions, but we're not going

19   to dig deep into facts that aren't presented in the

20   declaration because it does not have to do with the

21   standing argument that's before the Court and it's

22   not within the scope of jurisdictional discovery.

23   BY MR. BARTHLE:

24   Q.    Was there any e-mail systems down prior to

IN RE: FLAGSTAR DECEMBER 2021 DATA SECURITY INCIDENT LITIGATION
Jennifer Charters on 01/09/2024

Page 49

1    December 13th?

2        A.    No.

3        Q.    As far as you're aware, is this first e-mail

4    in Exhibit 12 on December 13th, 2021 the first

5    contact with the threat actor?

6        A.    As best I know.

7        Q.    And you referenced this earlier, and it says

8    it here, it refers to some calls.  Do you know who

9    was receiving calls?

10       A.    What I recall is that the threat actor was

11   making attempts to make calls to particularly our

12   CEO, and I guess I would say in somewhat of a

13   harassing way.

14       Q.    This refers -- it says, I made this e-mail

15   to talk to you.

16             Do you see that part?

17       A.    I do.

18       Q.    Do you know who the "I" is who made this

19   e-mail?

20       A.    This would have been Tetra Defense.

21       Q.    And you're not sure who the actual

22   individual there would have been?

23       A.    I do not know.

24       Q.    You didn't receive any calls from the threat

IN RE: FLAGSTAR DECEMBER 2021 DATA SECURITY INCIDENT LITIGATION
Jennifer Charters on 01/09/2024

Page 50

1    actor, correct?

2        A.   I did not.

3        Q.   And you didn't directly receive the fax, the

4    ransom related fax, Exhibit 21, right?

5        A.   Correct.

6        Q.   And then the e-mail related sort of ransom

7    demand went just to the CEO as well; is that correct?

8        A.   That is my understanding.

9        Q.   I'm going to direct you to -- back to your

10   declaration --

11       A.   Uh-huh.

12       Q.   -- Exhibit 19, paragraph 5, it says, On

13   December 31, 2021, Flagstar paid the threat actor

14   $1 million in Bitcoin.

15            Do you see that?

16       A.   I do.

17       Q.   Were you involved in the decision to make

18   that payment?

19       A.   I was not.

20       Q.   Who was involved?

21       A.   The CEO was involved, and he worked with our

22   insurance provider as well as legal counsel in -- and

23   the board of directors in making that decision.  To

24   the best of my ability, those are the individuals --

**IN RE: FLAGSTAR DECEMBER 2021 DATA SECURITY INCIDENT LITIGATION**
Jennifer Charters on 01/09/2024

1   or the groups that I am aware of that he talked to.

2   He obviously would have to tell you if he, you know,

3   got advice or anything from anyone else.

4       Q.   I kind of skipped over this earlier.   But

5   your role at Flagstar currently is what?

6       A.   Chief information officer.

7       Q.   And what is your responsibilities in that

8   role?

9       A.   I am responsible for overseeing the IT

10  organization, which includes various groups, whether

11  it be the infrastructure, data center, application

12  development teams, our data team, architecture.   We

13  have an IT delivery office that helps deliver

14  projects.   And I essentially run the business of IT,

15  which then also includes managing the financials and

16  the people who are involved -- involved in the IT

17  organization.   We are responsible for maintaining and

18  running the bank's technology.

19      Q.   And does information security department or

20  division, does that fall within your oversight?

21      A.   Information security does not report to me.

22      Q.   Who do they report to?

23      A.   The chief risk officer.

24      Q.   Given your responsibilities as the chief

IN RE: FLAGSTAR DECEMBER 2021 DATA SECURITY INCIDENT LITIGATION
Jennifer Charters on 01/09/2024

Page 52

1   information officer, why were you not involved in the

2   decision to make the ransom payment, if you know?

3            MS. LAPE:  Objection, speculation.

4   BY MR. BARTHLE:

5       Q.   You can answer.

6       A.   I provided input in terms of the operations

7   of the technology.  I was able to make statements

8   including -- or provide information in -- in terms of

9   the operational environment, which means systems were

10  up and running.  We did not need to get an encryption

11  key from a threat actor which meant that, you know,

12  it was not a requirement to get the systems back up

13  to pay the ransom.

14      Q.   How did you become aware that the decision

15  to pay the $1 million ransom was made?

16      A.   It was shared at our meetings.

17      Q.   Did you agree with that decision?

18      A.   I will tell you that it depends on the

19  situation as to whether or not to pay.  I don't

20  think -- it certainly does not help to incent threat

21  actors by paying them money to stop, I guess,

22  harassing you.  On the other hand, depending on the

23  situation that anyone is in, they could be in a

24  position where they want to be -- I guess I'll say

**IN RE: FLAGSTAR DECEMBER 2021 DATA SECURITY INCIDENT LITIGATION**
**Jennifer Charters on 01/09/2024**

 1   they want to protect information and it could be

 2   worth the cost to protect that data and information.

 3       **Q.   Do you know why Flagstar agreed to pay the**

 4   **ransom?**

 5       A.   I don't know all the factors that went into

 6   making that decision.

 7       **Q.   Were you involved in the actual process of**

 8   **making the payment?**

 9       A.   No, I was not.

10       **Q.   Who was involved in that?**

11       A.   Tetra Defense was involved.  I think they

12   have experience in how to set up a Bitcoin wallet,

13   and they also were involved in making sure that we

14   got what we were basically paying for as a result of

15   that payment.  I am certain that the CFO needed to be

16   involved in terms of transferring funds.  I don't

17   know who else may have been involved.

18       **Q.   And would you have become aware of how that**

19   **process occurred through these executive meetings**

20   **you've discussed earlier?**

21       A.   Some elements of those details, yes.

22       **Q.   How else would you have become aware of --**

23   **of your statement in paragraph 5?**

24       A.   The fact that we paid a million dollars in

1    Bitcoin was shared with the executive team.

2        **Q.   Do you recall who would have been reporting**

3    **that in these meetings?**

4        A.   The CEO would have reported it.

5        **Q.   Okay.  Direct you to paragraph 6 of your**

6    **declaration, Exhibit 19.  It says, The threat actor**

7    **subsequently provided Flagstar with access via RDP**

8    **and TeamViewer to the server where their exfiltrated**

9    **Flagstar data was stored.  Do you see that?**

10       A.   I do.

11       **Q.   Did I read that correctly?**

12       A.   You did.

13       **Q.   What is RDP?**

14       A.   Remote Desktop Protocol.

15       **Q.   And -- and what is that?**

16       A.   It enables a user to be able to get in to

17   another device remotely.

18       **Q.   And what is TeamViewer?**

19       A.   TeamViewer is another tool that allows you

20   to see information within another device.  So if

21   you're on your PC, you can see into a server.

22       Redacted

1      Redacted

8      Q.   Were you personally involved in accessing

9   the, quote, server where the exfiltrated Flagstar

10  data was stored?

11     A.   I was not personally involved.

12     Q.   And who would have been?

13     A.   This would have been -- Tetra Defense was

14  involved in this work.

15     Q.   How long after the ransom payment was made

16  was it before Flagstar was provided -- or I guess

17  Tetra was provided access to actually delete the

18  data?

19     A.   It was almost immediately.  I don't know

20  the -- the exact time frame that it -- that passed.

21  But it was very quickly after the payment was made,

22  we got in there because you -- we did not want time

23  to pass between them receiving the money and us being

24  able to confirm that we got what we paid for.

**IN RE: FLAGSTAR DECEMBER 2021 DATA SECURITY INCIDENT LITIGATION**
Jennifer Charters on 01/09/2024

Page 56

1    Q.   And almost immediately, are we talking

2    minutes, days?

3    A.   I would -- it was almost -- well, it was not

4    days.  It would have been minutes, hours.

5         In fact...

6    Q.   I'm going to show you what was previously

7    marked as Exhibit 11.  I believe this is another part

8    of an exchange with the threat actor over Gmail.

9    Have you ever seen this before?

10   A.   Yes, which I would then of course correct on

11   my prior statement.  It was days.  It was -- it looks

12   like six days later.

13   Q.   Right.  It appears from this e-mail string,

14   go to Bates page 17, middle of the page, Saturday,

15   January 8th, 4:01 p.m., there's an e-mail from

16   Flagstar Bank 727.  It says, We are just waiting for

17   one more erase to finish.

18        Do you see that?

19   A.   I do.

20   Q.   So does this refresh your recollection that

21   the erasing of the data didn't occur until

22   January 8th, 2022?

23   A.   No.  I would tell you that looking at this,

24   it appears that on January 10th is when it was

**IN RE: FLAGSTAR DECEMBER 2021 DATA SECURITY INCIDENT LITIGATION**
Jennifer Charters on 01/09/2024

Page 57

1    complete.

2        Q.   So certainly not minutes or hours after the

3    payment is made, correct?

4        A.   Correct.

5             MS. LAPE:   Objection.

6    BY MR. BARTHLE:

7        Q.   So it's true then that the threat actor had

8    access to the data for ten days after the payment was

9    made?

10       A.   It appears so.

11       Q.   And you don't know what the threat actor

12   might have done with it during that time, correct?

13       A.   I don't know.

14       Q.   Was that delay, this ten-ish day delay,

15   disclosed to consumers when the notice of the breach

16   was given?

17            MS. LAPE:   Objection.

18            You can answer it if you're able to.

19            THE WITNESS:   I don't know why we would have

20   communicated this to consumers.

21   BY MR. BARTHLE:

22       Q.   What about to regulators?

23       A.   I don't know.

24       Q.   Do you know -- I'm assuming it's not really

IN RE: FLAGSTAR DECEMBER 2021 DATA SECURITY INCIDENT LITIGATION
Jennifer Charters on 01/09/2024

Page 58

```
 1   within your job description.  But who, shareholders,

 2   board members, who this would or would not have been

 3   disclosed to, this delay?

 4            MS. LAPE:  I'm going to object again.

 5   There's nothing about communication in her

 6   declaration, and we've agreed that the scope of this

 7   will be specific to the facts set forth in the

 8   declaration.

 9            MR. BARTHLE:  Okay.  I'll withdraw the

10   question.

11   BY MR. BARTHLE:

12       Q.   All right.  I want to go back to paragraph

13   6, the second sentence.  It says, Flagstar's cyber

14   experts erased the drive on which the Flagstar data

15   was stored and monitored the process until it was

16   complete.

17            Do you see that?

18       A.   I do.

19       Q.   The Flagstar cyber experts referred to here,

20   is that Tetra?

21       A.   That is correct.

22       Q.   Anyone else?

23       A.   I'm not aware.

24       Q.   And I assume you remain unsure of who the
```

IN RE: FLAGSTAR DECEMBER 2021 DATA SECURITY INCIDENT LITIGATION
Jennifer Charters on 01/09/2024

Page 59

1   actual individuals were that were involved in that

2   process?

3       A.   I don't recall names of the Tetra Defense

4   individuals.

5       Q.   Did Tetra Defense conduct any dark web

6   monitoring at this time?

7       A.   They did not.

8       Q.   And as with the other things we've reviewed,

9   is it correct that you became informed about this

10  process via one of the executive incident response

11  meetings?

12      A.   Correct.

13      Q.   I think we touched on this earlier.  But how

14  does Flagstar know what data was compromised in the

15  incident?

16      A.   It is in our logs for the various systems

17  that were impacted.

18      Q.   And that review was done by the internal

19  information security team, correct?

20      A.   Along with Kroll, who was our forensics

21  team.

22      Q.   Prior to the deletion of the servers the

23  threat actor had, was there a comparison between what

24  was on that server and what Flagstar believed had

**IN RE: FLAGSTAR DECEMBER 2021 DATA SECURITY INCIDENT LITIGATION**
Jennifer Charters on 01/09/2024

Page 60

1    been taken?

2       A.   I think what you're asking is, was there a

3    comparison between the log data to what we saw in

4    what Tetra Defense may have seen when they went to

5    delete?  Is that what you're asking?

6       Q.   Correct.

7       A.   I don't know.

8       Q.   All right.  Back to paragraph 6, the last

9    sentence, The threat actor guaranteed that there were

10   no other copies of the data in the possession of

11   anyone outside of Flagstar.

12           Do you see that?

13      A.   I do.

14      Q.   How was this guarantee communicated?

15      A.   The guarantee is simply based off of the

16   discussion that is in the e-mails and --

17      Q.   I'm going to hand you what was previously

18   marked as paragraph -- I mean as Exhibit 13.

19           And I believe between 11, 12, and 13, these

20   are all the communications with the threat actor.

21   And my question is, is it solely from these

22   communications that you believe -- that your

23   understanding that there was a guarantee was made?

24      A.   Yes.

1      **Q.   Can you show me in these where that**

2  **guarantee is made?**

3      A.   I have to review to --

4      **Q.   Yes, ma'am.**

5      A.   -- see.

6      **Q.   Of course.**

7      A.   Give me a minute.

8         I'm looking for a very specific statement

9  that I recall seeing, and I'm trying to find it.

10       Okay.

11       Redacted

Page 62

1          Redacted

12          Q.    So that e-mail exchange is the -- the full

13    basis for your statement that, quote, the threat

14    actor guaranteed that there were no other copies of

15    the data in the possession of anyone outside of

16    Flagstar?

17          A.    That is correct.

18          Q.    It's not based on -- earlier we spoke about

19    there being some sort of calls of some kind, but your

20    understanding isn't related to any calls, just this

21    e-mail exchange, right?

22          A.    Correct.

23          Q.    Do you know whether the threat actor

24    actually fulfilled all of these agreements, the five

1   points there?

2       A.   To the best of our -- of my knowledge,

3   correct.  We have not seen the incident posted.  We

4   have not seen the data posted.  We have not had

5   ongoing conversation with the threat actor.  There

6   have been no additional attacks on us or NYCB, and

7   they did provide us some information on getting into

8   the network.

9       Redacted

16      Q.   Do you know whether that was the only

17  vulnerability that was exploited by the threat actors

18  in this case?

19      A.   It was not.

20           MS. LAPE:  Objection.  Again, I'd like to

21  caution you to stay within the scope of what we've

22  agreed upon today.

23  BY MR. BARTHLE:

24      Q.   It was not?

Page 64

```
 1      A.   It was not.

 2      Q.   I want to direct your attention to Exhibit

 3   11.  It's the last -- it's the bottom of the second

 4   to last page and the beginning of the first page.

 5   It's Bates 0017 and 0018.

 6           Someone from Tetra acting on Flagstar's

 7   behalf, is my understanding, says, I thought you

 8   telling us how the attack occurred was part of the

 9   deal.  Was there a vulnerability on one of our

10   external IPs?  What backdoors need to be removed?

11           Do you see that?

12      A.   I do.

13      Q.   Did the threat actor ever respond to that?

14      A.   I don't -- I am not aware.

15      Q.   Okay.  Turning back to your declaration,

16   Exhibit 19, paragraph 7, you wrote, It is my

17   understanding based on Flagstar -- Flagstar's

18   communications with the threat actor that the threat

19   actor destroyed the server after the data was

20   deleted.

21           Do you see that?

22      A.   I do.

23      Q.   The Flagstar communications that you're

24   referring to here, those are what we looked at in
```

**IN RE: FLAGSTAR DECEMBER 2021 DATA SECURITY INCIDENT LITIGATION**
Jennifer Charters on 01/09/2024

1   Exhibits 11, 12, and 13, correct?

2       A.   Correct.

3       Q.   And earlier when we discussed what you

4   reviewed in preparing the declaration, these

5   communications were not listed, right?

6       A.   When I prepared the declaration, that is

7   correct.  I did not review those.

8       Q.   So if you hadn't reviewed these

9   communications at that time, what was your

10  understanding of the threat actor's intention based

11  upon?

12          MS. LAPE:  Objection.  The witness

13  previously answered what her declaration was based

14  on.

15  BY MR. BARTHLE:

16      Q.   You can answer.

17      A.   I don't have any information on the threat

18  actor's intention, and I believe that that's what you

19  asked.  So what I am aware of is that Tetra Defense

20  worked with the threat actor to have access to the

21  environment and to validate that the data was gone

22  and that they no longer retained our information.

23      Q.   What -- what I'm trying to get at is here

24  you're declaring that it's your understanding that

IN RE: FLAGSTAR DECEMBER 2021 DATA SECURITY INCIDENT LITIGATION
Jennifer Charters on 01/09/2024

1   the threat actor destroyed the server, and I'm trying

2   to figure out how you know that.

3       A.   My knowledge is based on a set of e-mails

4   that are included here and what was communicated to

5   us at the various executive meetings related to the

6   incident.

7       Q.   All right.  And I think -- this sort of

8   maybe shortcut time.  Exhibit 11, if you go to Bates

9   page 17, it seems to be the only place where the

10  threat actor speaks about destroying the server.  You

11  can review that.  And my question will be, is there

12  anything other than the statements on this e-mail

13  exchange that your understanding about destruction of

14  the server is based?

15      A.   It is my understanding and I can confirm

16  that that is my understanding that it was deleted

17  based off of a threat actor's conversation with Tetra

18  Defense.  I have to go off of my understanding, and

19  that is what I understood to have occurred.  I still

20  believe that my statement is factually accurate.

21      Q.   I'm just trying to get at the source of your

22  understanding that it was destroyed, not that it was

23  deleted.  I understand the deletion question.  That

24  the actual servers were physically destroyed and --

**IN RE: FLAGSTAR DECEMBER 2021 DATA SECURITY INCIDENT LITIGATION**
Jennifer Charters on 01/09/2024

Page 67

1   and I think the answer is it's based on these

2   communications with the threat actor, correct?

3       A.   Correct.

4       Q.   Now, can you show me in here where the

5   threat actor says the server has been destroyed?

6       A.   I don't believe that there's anything in

7   here that confirms that it was destroyed, that states

8   that specifically.

9       Q.   And -- and Flagstar -- no one at Flagstar

10  viewed destruction of the server, correct?

11      A.   I am not aware of anyone viewing that.

12      Q.   Or anyone at Tetra?

13      A.   I am not aware.

14      Q.   Or anybody at Kroll, correct?

15      A.   It is my understanding.

16      Q.   Okay.  Paragraph 8, Exhibit 19, you write,

17  Immediately following the cyber incident, Flagstar

18  engaged Kroll Associates, Inc. to conduct a forensic

19  inspection of the data exfiltrated during the cyber

20  incident.  Kroll also conducted daily monitoring of

21  the dark web, including the site associated with the

22  threat actor, and identified no evidence that the

23  threat actor released any Flagstar data from the

24  cyber incident.

**IN RE: FLAGSTAR DECEMBER 2021 DATA SECURITY INCIDENT LITIGATION**
Jennifer Charters on 01/09/2024

Page 68

```
 1              Do you see that?

 2      A.   I do.

 3      Q.   And did I read it correctly?

 4      A.   I believe you did.

 5      Q.   Were you involved in the retention of Kroll

 6   that's related here in paragraph 8?

 7      A.   I was not responsible for the relationship

 8   with Kroll.

 9      Q.   When you say Flag- -- immediately following

10   the incident, is that the December 3rd and 4th time

11   frame or -- or what is considered immediately

12   following?

13      A.   Immediately following to me encompasses the

14   entire incident from start to finish.  It was -- you

15   could look at payment of the ransom with the threat

16   actor no longer communicating with us and no longer

17   in our environment as being really the sort of end of

18   the incident.  And so Kroll was involved, as I

19   mentioned, our managed detection and response vendor.

20   They were our MDR vendor before the incident.  They

21   were our MDR vendor after the incident.

22              So they were involved in being able to

23   perform various security monitoring for us both

24   before as well as after.  Specifically they were
```

**IN RE: FLAGSTAR DECEMBER 2021 DATA SECURITY INCIDENT LITIGATION**
Jennifer Charters on 01/09/2024

Page 69

1   looking at, you know, following the incident, looking

2   to see if there was any customer data on the dark

3   web.

4        Q.   So Flagstar had a preexisting contractual

5   relationship with Kroll prior to the incident

6   occurring?

7        A.   Correct.

8        Q.   And that, as you said, was related to MDR.

9   And what does that stand for again?

10       A.   Managed detection and response.

11       Q.   And this -- this immediate inspection --

12   well, it immediately was retained and did this

13   forensic inspection, correct?

14       A.   Correct.

15       Q.   And did it also begin dark web monitoring at

16   that time?

17       A.   Correct.

18       Q.   Do you know, when Flagstar uses Kroll for a

19   particular purpose, does it enter into separate

20   statements of work or contracts for those particular

21   engagements?

22       A.   Typically we will have a statement of work.

23   In the event of a, you know, managed service, a

24   managed service, they're engaged throughout and can

**IN RE: FLAGSTAR DECEMBER 2021 DATA SECURITY INCIDENT LITIGATION**
Jennifer Charters on 01/09/2024

Page 70

1  perform activities as it comes up.  So it may not be

2  specifically called out within a statement of work

3  but is part of the, you know, cyber monitoring that

4  is part of the -- in this case the managed detection

5  and response work that they do for us.

6            MR. BARTHLE:  So the next exhibit I'm going

7  to get into is pretty long.  It's probably going to

8  take awhile.  So I don't know if we want to start

9  that now or do lunch or then just have it all at the

10  end.

11            MS. LAPE:  We can break for lunch if -- if

12  that's what you prefer.

13            MR. BARTHLE:  Sure.

14            THE VIDEOGRAPHER:  We are going off the

15  record at 12:33 p.m.

16                      (Whereupon, a break was taken,

17                       after which the following

18                       proceedings were had:)

19                      (Whereupon, Deposition

20                       Exhibit No. 22 was marked.)

21            THE VIDEOGRAPHER:  We are going back on the

22  record at 1:13 p.m.

23  BY MR. BARTHLE:

**24       Q.   Before the break, we were talking about**

Page 71

```
 1   Kroll, correct?

 2        A.   I believe that's right.

 3        Q.   And are you familiar with Flagstar's process

 4   for how Kroll is retained and engaged in -- in any of

 5   these incidents?

 6             MS. LAPE:  Objection, vague.

 7   BY MR. BARTHLE:

 8        Q.   You can answer.

 9        A.   At a high level, I'm -- I'm aware of how we

10   engage vendors.

11        Q.   I'm going to show you what we'll mark as

12   Exhibit 22.  This is a list of -- a compilation of

13   agreements and statements of work that Kroll produced

14   in this case.  Are you familiar with all or any of

15   these?

16        A.   I have not had an opportunity to go through

17   these to tell you whether or not I'm familiar with

18   all of them.

19        Q.   Were you involved -- well, maybe -- do you

20   know whether Kroll was retained in connection with

21   the Accellion related breach?

22        A.   They were.

23        Q.   Could you could flip to what's Bates page 11

24   at the bottom there?
```

IN RE: FLAGSTAR DECEMBER 2021 DATA SECURITY INCIDENT LITIGATION
Jennifer Charters on 01/09/2024

Page 72

```
 1      A.    Okay.

 2      Q.    Do you know whether this letter agreement is

 3   what initiated the relationship between Flagstar and

 4   Kroll as related to the Accellion breach?

 5            MS. LAPE:  I object.  This is a letter to

 6   McDonald Hopkins, which is not Flagstar.  It's to

 7   legal counsel here.  So there's been no indication

 8   that --

 9            MR. BARTHLE:  I'll point out that --

10            MS. LAPE:  -- she's aware of this.

11            MR. BARTHLE:  -- it's signed by Flagstar at

12   page 15.

13            MS. LAPE:  For purposes of payment probably.

14   BY MR. BARTHLE:

15      Q.    So, again, my question is, do you know

16   whether this is the letter agreement that started the

17   relationship with Kroll as it relates to the

18   Accellion case?

19      A.    I do not know.

20      Q.    If you turn to Bates page 16, there's a

21   statement of work.  It's also dated January 27th,

22   2021.  It purports to be between Kroll, McDonald

23   Hopkins as counsel for Flagstar.  Okay.  Do you see

24   that?
```

IN RE: FLAGSTAR DECEMBER 2021 DATA SECURITY INCIDENT LITIGATION
Jennifer Charters on 01/09/2024

Page 73

```
 1      A.   I do.
 2      Q.   In this -- and the description of services
 3  refers to Phase 1, Accellion forensic investigation.
 4  Do you see that?
 5      A.   I do.
 6      Q.   Was Kroll involved in the forensic
 7  investigation related to the Accellion breach?
 8      A.   They were.
 9      Q.   Okay.  Do you know whether this was the
10  statement of work that set up that relationship?
11      A.   This appears to be the SOW, the statement of
12  work, that would have brought them into that review.
13      Q.   Okay.  And then if you turn over to Bates
14  page 24, have you ever seen this document before?
15      A.   I have not.
16      Q.   Do you know what Kroll Responder Powered by
17  Red Canary is?
18           MS. LAPE:  I'm going to object.  Again, this
19  is outside of the scope of her declaration.  We've
20  agreed to the scope of this deposition to be -- to be
21  specific to the facts of the declaration.
22           MR. BARTHLE:  And the facts of the
23  declaration are that Flagstar engaged Kroll to
24  immediately do dark web monitoring.  It's my
```

**IN RE: FLAGSTAR DECEMBER 2021 DATA SECURITY INCIDENT LITIGATION**
Jennifer Charters on 01/09/2024

1    understanding, if we follow through these, that dark

2    web monitoring didn't start for Kroll until October

3    of 2022.  So I think it's relevant.

4           MS. LAPE:  It is absolutely not relevant.

5    This is in March of 2021 --

6           MR. BARTHLE:  Exactly.

7           MS. LAPE:  -- which is before December of

8    2021, which is before the breach occurred.

9           MR. BARTHLE:  I understand that.  I need to

10   exclude these statements of work as being relevant to

11   the 2021 -- December 2021 breach.  I also need to

12   know whether Red Canary is the MDR that she testified

13   about earlier.  And I'll point out that this

14   statement of work specifically excludes the law firm

15   as a party.  So there's no privilege issue here.

16          MS. LAPE:  There's no privilege issue here,

17   but there's nothing in her declaration that talks

18   about what Kroll was doing in March of 2021, and we

19   have agreed that this deposition is about the

20   contents of her declaration and her declaration only.

21          MR. BARTHLE:  I just explained how it's

22   relevant.

23          MS. LAPE:  Show me the factual statement in

24   this declaration that a March 2021 engagement

**IN RE: FLAGSTAR DECEMBER 2021 DATA SECURITY INCIDENT LITIGATION**
Jennifer Charters on 01/09/2024

Page 75

1   responds to.

2        MR. BARTHLE:  I just explained paragraph 8

3   says, Immediately following the cyber incident,

4   Flagstar engaged Kroll to conduct an inspection and

5   to do daily monitoring of the dark web.

6        My understanding of every statement of work

7   and every agreement with Kroll is that doesn't

8   occur -- dark web monitoring doesn't occur as it

9   relates to the December 2021 breach until October of

10  2022.

11       MS. LAPE:  Why don't you ask her the

12  question.

13       MR. BARTHLE:  I -- I will ask this in the

14  order that I want to ask it.  It's my deposition.

15  I'm sorry.  You can ask your --

16       MS. LAPE:  Okay.

17       MR. BARTHLE:  -- questions as you want to

18  ask them.

19       MS. LAPE:  We have an agreement on

20  December 5th, 2023, which I can provide to you, in

21  which you agreed that this would be limited to the

22  facts in the declaration.  If you determine that you

23  need to exceed the facts in the declaration, then we

24  can stop the deposition and we will move for a

**IN RE: FLAGSTAR DECEMBER 2021 DATA SECURITY INCIDENT LITIGATION**
Jennifer Charters on 01/09/2024

Page 76

```
1    protective order under Rule 30(d).

2            But we had a very limited agreement here.

3    So you can ask her the factual questions.  But going

4    through exhibits from 2021, March of 2021, before the

5    breach even occurred is not related to the facts in

6    her deposition.

7            MR. BARTHLE:  Okay.  Do you agree then that

8    any relationship with Kroll prior to December of 2021

9    had nothing to do with any services that Kroll

10   provided as it relates to this breach?

11           MS. LAPE:  No, that is not the -- what I'm

12   saying.

13           MR. BARTHLE:  Okay.  Then how can I

14   determine whether Kroll had an agreement or provided

15   services relevant to the breach that we're here to

16   discuss if I can't ask what these things were for?

17           MS. LAPE:  You can ask her about the facts

18   in her declaration that relate to standing in this

19   case.  And in the event you are successful in

20   opposing the motion to dismiss, the witness is

21   required to come back pursuant to Rule 30 and

22   pursuant to our agreement and continue to answer

23   questions in this case.  That -- but -- but there's

24   nothing pursuant to our agreement that would allow
```

IN RE: FLAGSTAR DECEMBER 2021 DATA SECURITY INCIDENT LITIGATION
Jennifer Charters on 01/09/2024

1  you to ask questions about this.  This is outside of

2  her declaration facts.

3  BY MR. BARTHLE:

4      Q.    You testified about Kroll providing MDR

5  services, correct?

6      A.    I did.

7      Q.    Is that what Red Canary is?

8      A.    That is correct.

9      Q.    And those services were being provided by

10  Kroll to Flagstar beginning in March of 2021?

11      A.    That is correct.

12      Q.    Were those services also being provided in

13  December of 2021?

14      A.    That is correct.

15      Q.    Is it your understanding that Red Canary

16  involves dark web monitoring?

17      A.    I am not fully versed on all of the set of

18  services.  But if I were to read what it describes

19  here, there's a number of different elements of the

20  support that they provide, including threat analysis,

21  intelligence advice on new and emerging threats of

22  interest, threat correlation, root cause analysis,

23  periodic threat landscape, detection, review and

24  service, update, teleconferences, malware analysis,

**IN RE: FLAGSTAR DECEMBER 2021 DATA SECURITY INCIDENT LITIGATION**
Jennifer Charters on 01/09/2024

Page 78

1    e-mail based customer support for nonemergency

2    requests, and then it looks like there's an ability

3    to get on-demand cybersecurity services.

4        **Q.   So -- so, again, do you have any**

5    **understanding whether Kroll provides dark web**

6    **monitoring through this Red Canary service?**

7        A.   I am not aware of any specifics to dark web

8    monitoring here.

9        **Q.   All right.  If you turn to Bates 36.**

10       A.   Okay.

11       **Q.   Would this have been a statement of work**

12   **related to the December 2021 cyber incident?**

13       A.   Yes.  From what I can see here, yes.

14            And I just want to remind you that I would

15   not have been the one to enter into these agreements.

16   While I may be aware of some of them, I was not

17   responsible for entering into the agreements because

18   that was part of the information security team's

19   responsibility.

20       **Q.   And who in info sec would have been the one**

21   **interacting with Kroll on these documents?**

22       A.   The CISO.

23       **Q.   And that was Zah?**

24       A.   Zah.

IN RE: FLAGSTAR DECEMBER 2021 DATA SECURITY INCIDENT LITIGATION
Jennifer Charters on 01/09/2024

```
 1     Q.   Zah.

 2     A.   Zah.

 3     Q.   Okay.

 4     A.   Uh-huh.

 5     Q.   On this statement of work here on Bates page

 6   36 of Exhibit 22, if we look at the description of

 7   services, the --

 8     A.   Yeah.

 9     Q.   -- fifth bullet, If possible from available

10   forensic evidence, fully enumerate scope of exposure

11   around sensitive data.

12          Do you see that?

13     A.   I do.

14     Q.   What -- what is that explaining that Kroll

15   was doing?

16     A.   Based on whatever logs and so forth that we

17   would have provided, enumerate is basically create a

18   list of basically the data that may have been

19   breached.

20     Q.   All right.  And that's the analysis that you

21   spoke about earlier that preceded what the Flagstar

22   data analytics people did?

23     A.   That is correct.  That is correct.  So this

24   likely was the line item that helped them review that
```

**IN RE: FLAGSTAR DECEMBER 2021 DATA SECURITY INCIDENT LITIGATION**
Jennifer Charters on 01/09/2024

Page 80

1    data and make sure that they understood what data was

2    exposed.

3        Q.   Now I want you to turn to Bates page 42.

4    And this appears to be an amendment to that statement

5    of work from March 16th of 2022.

6        A.   I want to pause on what I just said.  So

7    what we just talked about in terms of that bullet,

8    that bullet is not the only bullet that covers their

9    review of data.  So if you look at, you know, Phase 2

10   and Phase 3 -- or sorry -- Phase 2b, that's the

11   sensitive data detection.  This is where they're

12   actually doing that work to go through, review,

13   identify all of the data.  So this SOW does include

14   the work that we talked about.  That bullet is not

15   the only bullet that articulates the scope of that

16   work.

17       Q.   Okay.  I understand.  Thank you for that.

18       A.   Yeah.

19       Q.   Can you turn to page 42?

20       A.   Okay.

21       Q.   All right.  And this is an amendment to that

22   statement of work from March 16th of 2022.  Do you

23   see that?

24       A.   Yes.

**IN RE: FLAGSTAR DECEMBER 2021 DATA SECURITY INCIDENT LITIGATION**
Jennifer Charters on 01/09/2024

Page 81

1    Q.    All right.  There's a sort -- a fairly

2    similar bullet to the one we just read.  I think it's

3    now the sixth.  And it says, If possible from

4    available forensic evidence, fully enumerate scope of

5    exposure around sensitive data related to both

6    incidents.

7              Do you see that?

8    A.    I do.

9    Q.    What is "both incidents" referring to here?

10   A.    I would have to speculate.  I don't know.

11   Q.    All right.  And on that -- that same page,

12   if you go to the -- the second bullet from the bottom

13   in Phase 1.

14   A.    Uh-huh.

15   Q.    It starts with Attempt.

16   A.    Yep.

17   Q.    Do you see, Attempt to identify if

18   additional sensitive data, PI, PII, PFI, or PHI to

19   include areas of the network where stored were

20   exposed as a result of any identified compromise.

21             Do you see that?

22   A.    I do.

23   Q.    What is that describing?

24   A.    My understanding of this statement as I read

IN RE: FLAGSTAR DECEMBER 2021 DATA SECURITY INCIDENT LITIGATION
Jennifer Charters on 01/09/2024

Page 82

```
 1   it, the way I would interpret it, is for -- as part
 2   of their forensics analysis, to go beyond just the
 3   files that were exfiltrated but to look within the
 4   entire environment to identify if it was possible
 5   that there was any other data that was exposed.
 6       Q.   Okay.  So Flagstar anticipated a scenario in
 7   which additional sensitive data might have been
 8   exposed during the incident?
 9            MS. LAPE:  Objection, out of scope and it
10   calls for speculation.
11            THE WITNESS:  I -- I was going to have to
12   say I -- I would have to speculate on that.  There
13   was no belief that there was additional data exposed.
14   This was a way to validate that no other data was
15   exposed.
16   BY MR. BARTHLE:
17       Q.   Okay.  If you turn to page -- Bates page 46.
18            Are you familiar with this SOW with Kroll?
19       A.   I am not.
20       Q.   It appears to be related to data breach
21   notification, identity monitoring services?
22       A.   Yes.
23       Q.   Is it your understanding that this doesn't
24   have anything to do with the December 2021
```

**IN RE: FLAGSTAR DECEMBER 2021 DATA SECURITY INCIDENT LITIGATION**
Jennifer Charters on 01/09/2024

Page 83

1    investigation, response; it doesn't have -- it's not

2    involved in that aspect of the incident?

3        A.   That is correct.

4        Q.   All right.  So in these statements of work

5    related to this incident, I don't see anything that

6    refers to dark web monitoring.  Am I missing

7    something in these December 2021 statements of work

8    that encompass that?

9        A.   Let me take a quick look since this is the

10   first time I'm seeing this.

11           Just -- could I have you repeat the question

12   for me so I understand the scope of the question?

13       Q.   So in the statements of work related to the

14   December 2021 incident, I don't see anything that

15   refers to dark web monitoring.  Am I missing

16   something that encompasses that work?

17       A.   I don't specifically see it called out,

18   other than in the bullet on the indent, cyber risk

19   services under managed security where they talk about

20   cyber -- or sorry -- managed detection response, dark

21   web monitoring, cyber threat intelligence.  But

22   that's it.

23       Q.   All right.  If you turn to Bates page 29.

24       A.   Okay.

**IN RE: FLAGSTAR DECEMBER 2021 DATA SECURITY INCIDENT LITIGATION**
Jennifer Charters on 01/09/2024

Page 84

1    Q.   This seems to be another statement of work

2    that's from October of 2022.  Do you see that?

3    A.   I do.

4    Q.   It refers to the letter of engagement

5    entered into on December 3rd, 2021.  Do you see that?

6    A.   I do.

7    Q.   All right.  And this refers to dark web

8    investigation as -- under the Description of

9    Services, correct?

10   A.   It does.

11   Q.   It's true then, is it not, that Kroll's dark

12   web investigation as it relates to this case didn't

13   start until October of 2022?

14        MS. LAPE:  Objection, form.

15   BY MR. BARTHLE:

16   Q.   You can answer.

17   A.   Oh.  I -- from this, it appears that the

18   dark web investigation began on October 14th, 2022.

19   Q.   Did you have any role in interfacing with

20   Kroll related to the dark web investigation?

21   A.   No, I did not.

22   Q.   Who would have at this time in October of

23   2022?

24   A.   This would have been run on behalf of

Page 85

```
 1    information security.
 2        Q.    Would it still have been Zah at that time?
 3        A.    I don't recall when Zah left the
 4    organization.  I don't -- I just don't recall when
 5    she left.  So whether it was her or somebody else.
 6    When I look at who signed this, Jim Giszczak, who was
 7    McDonald Hopkins, and Paul Borja who was legal for
 8    Flagstar.  So it is not clear to me who other than
 9    those individuals would have been involved in signing
10    up for this service.
11        Q.    You referenced a -- a Jim from McDonald
12    Hopkins that was the breach coach?
13        A.    Yes.
14        Q.    Is it this Jim?
15        A.    It is that Jim, that's correct.
16        Q.    Since you weren't involved in this exchange,
17    I assume you don't know how the outcome of this
18    investigation was reported to Flagstar?
19        A.    I don't know the specifics behind it, other
20    than it says here, Provide client counsel with a
21    verbal presentation and summary report upon
22    conclusion of the engagement.
23        Q.    Were you involved in that presentation?
24        A.    I was not.
```

**IN RE: FLAGSTAR DECEMBER 2021 DATA SECURITY INCIDENT LITIGATION**
Jennifer Charters on 01/09/2024

Page 86

1     Q.   Do you know who was?

2     A.   I do not know, but based off of client and

3  counsel, I'm assuming that it would have been our

4  information security and our -- and perhaps legal.

5     Q.   Under Description of Services, it refers to

6  -- it says, Client will work with Kroll's analyst

7  team to set up an initial list of keywords to be

8  researched on the dark web.

9        Do you see that?

10   A.   Yes, I do.

11    Q.   Are you familiar with that keyword process?

12   A.   I am familiar with the process.

13    Q.   In this instance?

14   A.   Not necessarily this specific instance.  But

15  as I referenced previously in the production of the

16  list of PII data that may have been exfiltrated,

17  giving them information around, this is what an

18  account number looks like at Flagstar.  This is what,

19  you know, a loan number looks like at Flagstar.

20    Q.   Do you have an understanding of what these

21  keywords were that Flagstar provided to Kroll to

22  research?

23   A.   I did not see the list.

24    Q.   All right.  I'm going to direct you back to

Page 87

```
 1   your declaration, paragraph 19 -- Exhibit 19,

 2   paragraph 9.  You wrote, Due to the size and

 3   complexity of the exfiltrated data, including that

 4   much of it was unstructured and required an extensive

 5   manual review, Kroll's forensic inspection took until

 6   June 2nd, 2022, to complete.  At that time Flagstar

 7   identified and finalized a list of individuals whose

 8   personal information was compromised during the cyber

 9   incident.

10           Do you see that?

11       A.   I see it.

12       Q.   Did I read that correctly?

13       A.   You did.

14       Q.   The forensic inspection that's referred to

15   here in paragraph 9, is that the same inspection

16   that's referenced in paragraph 8?

17       A.   Correct.

18       Q.   And is this the -- also the same process

19   that you -- you spoke about earlier that was used in

20   creating the -- the lists that we spoke about in

21   Exhibit 20?

22       A.   That is correct.

23       Q.   And I think your testimony was that the --

24   the lists from Exhibit 20 were created around March
```

**IN RE: FLAGSTAR DECEMBER 2021 DATA SECURITY INCIDENT LITIGATION**
Jennifer Charters on 01/09/2024

Page 88

1  of 2022; is that right?

2      A.   I don't recall -- I'm going to have -- I

3  would have to go back and look at what I referred to

4  as March.  The data was first pulled by Kroll and

5  then sent to our team to do additional analysis on

6  it.  But all of that work took until June -- June 2nd

7  to complete before we were able to send letters.

8      Q.   What is unstructured data?

9      A.   Unstructured data basically means something

10  like a document, an e-mail, something that's not in a

11  database.  So it's not easily categorized into fields

12  that you can reference.  It's kind of a blob.

13      Q.   And the -- the forensic inspection that

14  Kroll engaged in was what you spoke about earlier.

15  It's trying to figure out what PII elements are in

16  this universe of data?

17      A.   Correct.

18      Q.   Do -- do you know that -- well, is it

19  accurate to say that that occurred via use of keyword

20  searches?

21      A.   There were two ways that they conducted the

22  work, and that was shown in that SOW as well.  There

23  were automated ways of finding data and then there

24  were manual ways of finding data.  So in some cases,

**IN RE: FLAGSTAR DECEMBER 2021 DATA SECURITY INCIDENT LITIGATION**
Jennifer Charters on 01/09/2024

1   it was a computer program that was able to scan a

2   document, for example, to look for a field.  And in

3   other cases, a human had to look at a document to

4   determine and derive whether or not there was PII

5   data in it.

6       **Q.   Did you oversee any of Kroll's work in this**

7   **inspection?**

8       A.   I did not.

9       **Q.   That would have been someone from**

10  **information security or who would have been doing**

11  **that?**

12      A.   That's correct.  Information security is --

13  along with our partners at Kroll.  Kroll was -- well,

14  I guess we would have been overseeing Kroll, but

15  Kroll was also in some cases -- you know, they were

16  doing the work.  So they were overseeing their

17  resources who were doing the work to actually find

18  the data.

19      **Q.   In the -- I guess the deliverable from this**

20  **inspection was what?**

21      A.   The deliverable would have been a list of

22  individuals with whatever data elements were

23  potentially exfiltrated.

24      **Q.   And was that in like a database or a**

IN RE: FLAGSTAR DECEMBER 2021 DATA SECURITY INCIDENT LITIGATION
Jennifer Charters on 01/09/2024

1  spreadsheet, or what was that?

2      A.   It was -- my understanding is it came to us

3  in a spreadsheet.

4      Q.   Have you ever seen that original

5  deliverable?

6      A.   I did not see the original deliverable

7  coming from Kroll.

8      Q.   That is the deliverable that went to the

9  data analytics team?

10     A.   That is correct.

11     Q.   And then they used that to create the lists

12 that we talked about in Exhibit 20, correct?

13     A.   That is correct.

14     Q.   All right.  In paragraph 9, it says, second

15 sentence, At that time Flagstar identified and

16 finalized a list of individuals whose personal

17 information was compromised during the cyber

18 incident.

19          Do you see that?

20     A.   I do.

21     Q.   And is that what ultimately was excerpted in

22 Exhibit 20?

23          MS. LAPE:  Objection.

24          THE WITNESS:  This --

**IN RE: FLAGSTAR DECEMBER 2021 DATA SECURITY INCIDENT LITIGATION**
Jennifer Charters on 01/09/2024

Page 91

1          MS. LAPE:  You can answer.

2          THE WITNESS:  This document is an excerpt of

3     the overall set of document that -- or set of data

4     that was prepared for Flagstar.

5     BY MR. BARTHLE:

6          Q.   Well, let me ask a simple question.  It says

7     Flagstar identified and finalized a list of

8     individuals, right?

9          A.   That is correct.

10         Q.   How did that happen?

11         A.   Based on the data that we received from

12    Kroll, we went back to our database and we pulled as

13    much of the, you know, contact information we could

14    from that data warehouse.

15         Q.   Okay.  And that's -- the folks who would

16    have been dealing with that, that was Kamala and

17    Jeremy and Greg Hubble, right?

18         A.   Correct.

19         Q.   You were not personally involved in

20    preparing that list, correct?

21         A.   That is correct.

22         Q.   Okay.  Paragraph 10.  I have reviewed that

23    list and can confirm the following.

24              Do you see that?

**IN RE: FLAGSTAR DECEMBER 2021 DATA SECURITY INCIDENT LITIGATION**
Jennifer Charters on 01/09/2024

Page 92

1        A.    I do.

2        Q.    Can you explain what you did here to prepare

3   this paragraph?

4        A.    To be clear, I did not prepare the

5   paragraph.  But I reviewed the paragraph based off of

6   the names that were on here and looking against the

7   master list of customer records.

8        Q.    So you looked at the list that we see an

9   excerpt from in paragraph 20, correct?

10       A.    Correct.

11       Q.    And that was prepared by the data analytics

12   folks?

13       A.    Correct.

14       Q.    And they prepared that by using the

15   information from Kroll, right?

16       A.    Correct.

17       Q.    And then here, you're just listing

18   essentially what Exhibit 20 shows; is that right?

19       A.    I'm not listing what Exhibit 20 shows.  It

20   is -- this had specific information that was not

21   exfiltrated in this first case.  So this -- it would

22   not show on Exhibit 20.

23       Q.    Okay.  So, for instance, as to paragraph

24   10(a) here, you wrote, John Scott Smith's personal

Page 93

1    and business bank account information was not

2    exfiltrated during the cyber incident.  Is that read

3    correctly?

4         A.   That is read correctly.

5         Q.   Okay.  So you would have gone and looked at

6    the list from Exhibit 20 and confirmed that those

7    data elements are not present in the column for

8    exposed elements for Mr. Smith; is that right?

9         A.   That is correct.

10        Q.   So is -- is paragraph 10, you're just

11   comparing what's in Exhibit 20 and making statements

12   about what is or is not there, correct?

13        A.   Correct.

14        Q.   In the original spreadsheet that Exhibit 20

15   was derived from, does it list everybody who Flagstar

16   or Kroll determined was impacted in the cyber

17   incident?

18        A.   It does.

19        Q.   And it lists all fields of data for each

20   individual that was potentially impacted in the

21   incident?

22        A.   It does.

23             I just want to make sure I'm -- I'm clear on

24   that.  It did not list every piece of data.  It

Page 94

```
 1    listed every piece of PII type data.  So if, for

 2    example, there was -- I'm trying to think about, you

 3    know, maybe a check image or something like that.  If

 4    their signature was on there, we would not have

 5    identified that the signature was in this list

 6    because the signature not being a piece of PII data.

 7        Q.   And -- and what's the definition that you're

 8    using here for -- for things that are -- are PII

 9    data?

10        A.   So we consider personally identifiable

11    information, PII, which generally can include --

12    there's a number of different elements.  I don't have

13    them all memorized.  But it will usually include

14    name, something that identifies that individual, and

15    some sort of relevant sensitive information such as a

16    Social Security number, perhaps a telephone number,

17    an address, a bank account number.  A bank account

18    number by itself is not PII.  A bank account number

19    with an individual is considered PII.

20        Q.   All right.  Paragraph 11 of your

21    declaration, Exhibit 19, in January 2021, Accellion,

22    Inc., a vendor that Flagstar used for its secure file

23    sharing platform informed Flagstar that the platform

24    had a vulnerability that was exploited by an
```

IN RE: FLAGSTAR DECEMBER 2021 DATA SECURITY INCIDENT LITIGATION
Jennifer Charters on 01/09/2024

Page 95

1    unauthorized party.  Flagstar permanently

2    discontinued use of the file sharing platform but

3    subsequently learned that the unauthorized party was

4    able to access some of Flagstar's data on the

5    Accellion platform, including customer personal

6    information, the Accellion incident.  It is my

7    understanding that the data compromised during the

8    Accellion incident was made available on the dark

9    web.

10           Did I read that correctly?

11      A.   You did.

12      Q.   What was your involvement in the Accellion

13   incident?

14      A.   Much like this -- the incident that we've

15   been focused on, I was the CIO at the time.  So my

16   role was both in terms of patching the system,

17   upgrading the system.  I did participate in the

18   executive meetings that we had relative to the

19   incident itself and provided my, I guess, view of the

20   technical environment and operations of that

21   technical environment.

22      Q.   Did you have any personal involvement in

23   determining whether Flagstar data from the Accellion

24   incident was made available on the dark web?

IN RE: FLAGSTAR DECEMBER 2021 DATA SECURITY INCIDENT LITIGATION
Jennifer Charters on 01/09/2024

Page 96

1      A.    Can you repeat that?

**2      Q.    Did you have any personal involvement in**

**3   determining that Flagstar data was made available on**

**4   the dark web from the Accellion incident?**

5      A.    I did not personally go out to the dark web

6   to find that data.  I was made aware that the data

7   was there.

**8      Q.    And that's my next question.  How did you**

**9   become aware of that understanding?**

10     A.    The information security team, along with

11   the forensics provider that we used, went to -- and

12   there -- there was a portal where the data was made

13   available.

**14     Q.    Was the forensic provider in that case also**

**15   Kroll?**

16     A.    Yes.

**17     Q.    Do you know what the information security**

**18   team or Kroll did to determine that this information**

**19   was available on the dark web?**

20     A.    They did go out to the portal that the

21   threat actor provided and looked at the data.

**22     Q.    Do you know who -- individuals who did that?**

23     A.    I do not know.

**24     Q.    Do you know how it was determined that that**

IN RE: FLAGSTAR DECEMBER 2021 DATA SECURITY INCIDENT LITIGATION
Jennifer Charters on 01/09/2024

Page 97

1   information derived from the Accellion incident

2   versus something else?

3       A.   Yes.

4       Q.   And how was that done?

5       A.   There was -- just like with the second, we

6   had logs where there was an indication of what data

7   was taken and we could match that data from that log

8   against the portal that was provided by the threat

9   actor.

10      Q.   All right.  Paragraph 12 of your

11  declaration, Exhibit 19, I have reviewed the list of

12  individuals impacted during the Accellion incident

13  and can confirm that the following plaintiffs have

14  personal information compromised in the Accellion

15  incident:  John Scott Smith, Christopher P. Kennedy,

16  Mark Wiedder, Rafael Hernandez, Hassan Nasrallah,

17  Nathan Silva, and Everett Turner.

18           Do you see that?

19      A.   I do.

20      Q.   Did I read that correctly?

21      A.   You did.  I cannot guarantee you pronounced

22  all the names correctly, but yes.

23      Q.   This list of individuals impacted during the

24  Accellion incident, where did that come from?

**IN RE: FLAGSTAR DECEMBER 2021 DATA SECURITY INCIDENT LITIGATION**
Jennifer Charters on 01/09/2024

Page 98

1      A.    So the list of individuals was contained in

2   the master list that we had regarding all of the --

3   the breached customers and data from the Accellion

4   incident.

5      Q.    And were you involved in the creation of

6   that list?

7      A.    I was not.

8      Q.    Would Kroll have been the one responsible

9   for creating that list as well?

10      A.    This followed the same process that we used

11   before.  Kroll produced an initial list.  And then

12   the same individuals that were involved in the second

13   incident were the same individuals who created the

14   list so that we could find contact information to

15   notify those individuals.

16      Q.    And, again, like with the incident we're

17   here about, you weren't involved in overseeing

18   Kroll's analysis, correct?

19      A.    That is correct.

20      Q.    And you weren't involved in confirming its

21   accuracy, right?

22      A.    I was not responsible for overseeing Kroll.

23      Q.    Does that list from the Accellion incident,

24   does that still exist today?

**IN RE: FLAGSTAR DECEMBER 2021 DATA SECURITY INCIDENT LITIGATION**
Jennifer Charters on 01/09/2024

Page 99

```
 1      A.   Yes.

 2      Q.   And was it in a similar deliverable format

 3   as Flagstar received it related to the December 2021

 4   incident?

 5      A.   Yes.

 6      Q.   And the -- the list of individuals impacted

 7   in Accellion that you referred to in paragraph 12, is

 8   it -- my understanding correct that that excerpt is

 9   the second page of Exhibit 20?

10      A.   Yes.

11           MR. BARTHLE:  I think I'm probably done, but

12   I'd like to just circle up with Jordan for five

13   minutes and...

14           THE WITNESS:  Okay.

15           THE VIDEOGRAPHER:  We are going off the

16   record at 1:57 p.m.

17                      (Whereupon, a break was taken,

18                       after which the following

19                       proceedings were had:)

20           THE VIDEOGRAPHER:  We are going back on the

21   record at 2:13 p.m.

22           MR. BARTHLE:  Ms. Charters, thank you for

23   your time.  I have no further questions.

24           MS. LAPE:  I have no questions.
```

**IN RE: FLAGSTAR DECEMBER 2021 DATA SECURITY INCIDENT LITIGATION**
Jennifer Charters on 01/09/2024

Page 100

```
 1              THE COURT REPORTER:  Signature.

 2              MS. LAPE:  Yes, please.

 3              THE COURT REPORTER:  Do you want a rough

 4    draft?

 5              MS. SIELING:  Yes.

 6              MS. LAPE:  Do we have a standing order or

 7    no?

 8              MS. SIELING:  No.

 9              THE VIDEOGRAPHER:  Does anybody want to get

10    the video order?  Can I get that on the record?

11              MR. BARTHLE:  Whatever our standing thing

12    with Huseby is, we'll just do that.

13              THE VIDEOGRAPHER:  Okay.

14              MS. SIELING:  We'll take the video.

15              THE VIDEOGRAPHER:  Video?

16              MS. SIELING:  Yeah.

17              THE VIDEOGRAPHER:  Okay.  We are going off

18    the record at 2:13 p.m.

19              THE COURT REPORTER:  Do you want a rough?

20              MR. BARTHLE:  No.

21              THE COURT REPORTER:  What about delivery?

22              MS. SIELING:  We're fine with normal

23    delivery.

24              THE COURT REPORTER:  The same?
```

**IN RE: FLAGSTAR DECEMBER 2021 DATA SECURITY INCIDENT LITIGATION**
Jennifer Charters on 01/09/2024

Page 101

 1            MR. BARTHLE:  Whatever we got.  I think we

 2    get the full Monte from...

 3                  (Witness excused at 2:14 p.m.)

 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

**IN RE: FLAGSTAR DECEMBER 2021 DATA SECURITY INCIDENT LITIGATION**
Jennifer Charters on 01/09/2024

Page 102

```
 1              IN THE UNITED STATES DISTRICT COURT
                   EASTERN DISTRICT OF MICHIGAN
 2


 3
        IN RE:
 4      FLAGSTAR DECEMBER 2021 DATA   ) Case No.
        SECURITY INCIDENT LITIGATION, ) 4:22-cv-11385
 5      _____)

 6

 7              I hereby certify that I have read the

 8      foregoing transcript of my deposition given at the

 9      time and place aforesaid, consisting of Pages 1 to

10      104, inclusive, and I do again subscribe and make

11      oath that the same is a true, correct and complete

12      transcript of my deposition so given as aforesaid,

13      and includes changes, if any, so made by me.

14

15                              JENNIFER CHARTERS

16      SUBSCRIBED AND SWORN TO

17      Before me this        day

18      of                , A.D. 2024.

19            Notary Public

20

21

22

23

24
```

**IN RE: FLAGSTAR DECEMBER 2021 DATA SECURITY INCIDENT LITIGATION**
Jennifer Charters on 01/09/2024

Page 103

```
1   STATE OF ILLINOIS   )

2                       )  SS:

3   COUNTY OF C O O K   )

4

5

6           I, Michelle A. Duzan, CSR No. 084-004270, a

7   Notary Public within and for the County of Cook,

8   State of Illinois, and a Certified Shorthand Reporter

9   of said state, do hereby certify:

10          That previous to the commencement of the

11  examination of the witness, the witness was duly

12  sworn to testify the whole truth concerning the

13  matters herein;

14          That the foregoing deposition transcript was

15  reported stenographically by me, was thereafter

16  reduced to typewriting under my personal direction

17  and constitutes a true record of the testimony given

18  and the proceedings had;

19          That the said deposition was taken before me

20  at the time and place specified;

21          That I am not a relative or employee or

22  attorney or counsel, nor a relative or employee of

23  such attorney or counsel for any of the parties

24  hereto, nor interested directly or indirectly in the
```

**IN RE: FLAGSTAR DECEMBER 2021 DATA SECURITY INCIDENT LITIGATION**
Jennifer Charters on 01/09/2024

Page 104

1    outcome of this action.

2            IN WITNESS WHEREOF, I do hereunto set my

3    hand and affix my seal of office at Orland Park,

4    Illinois, this 9th day of January, 2024.

5

6                    *Michelle Duzan*

7

8

9            Notary Public, Cook County, Illinois.

10           My commission expires 11/01/27.

11           Michelle A. Duzan, CSR, RMR

12              CSR No. 084-004270

13

14

15

16

17

18

19

20

21

22

23

24

**IN RE: FLAGSTAR DECEMBER 2021 DATA SECURITY INCIDENT LITIGATION**
Jennifer Charters on 01/09/2024

**Page 105**

```
 1                    CHANGES AND SIGNATURE

 2    WITNESS NAME:  Jennifer Charters, 01/09/2024

 3    PAGE    LINE    CHANGE             REASON

 4    _____

 5    _____

 6    _____

 7    _____

 8    _____

 9    _____

10    _____

11    _____

12    _____

13    _____

14    _____

15    _____

16    _____

17    _____

18    _____

19    _____

20       I,  Jennifer Charters, have read the foregoing

21    transcript and hereby affix my signature that same is

22    true and correct, except as noted above.

23

24                 _____

25                      Jennifer Charters
```