# EXHIBIT 5

## REDACTED VERSION OF DOCUMENT TO BE SEALED

1                    UNITED STATES DISTRICT COURT

2                    EASTERN DISTRICT OF MICHIGAN

3    ------------------------   X

4    In re Flagstar December       :

5    2021 Data Security            : Case No. 4:22-cv-11385

6    Incident Litigation           :

7    ------------------------   X

8

9        ***HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY***

10                  Videotaped Deposition of

11                      WILLIAM HARDIN

12               Thursday, November 16, 2023

13                 9:50 AM to 5:33 PM CST

14

15

16

17

18

19

20

21

22

23

24   Zoom Remotely Reported by: Melody Stephenson, BBA,

25    FCRR, CRR, CRC, RPR, RSA, MO CCR 406, IA CSR 974

Page 31

```
1    talk to Dillon, but most likely not.  I think on

2    your Exhibit 3, the engagement letter's in

3    October.  So from that perspective, it looks like

4    the work started in late October.

5        Q  So if you wanted to go back to your firm

6    and figure out what invoices were submitted to

7    Flagstar, that would be something you would

8    consult with Dillon McBride; is that right?

9        A  That's correct.  Yes.

10       Q  As you sit here today, you don't have any

11   reason to believe that you or your firm performed

12   work on this matter before October 28th, 2022; is

13   that right?

14       A  That's correct.

15       Q  Okay.  I'm handing you what I've marked as

16   Exhibit 5.  This appears to be an invoice from

17   December 30th, 2022.  Please take a second to

18   review it.

19       A  Sure.  Okay.

20       Q  Is this a fair-and-accurate copy of the

21   invoice you submitted on December 30th, 2022?

22       A  Yes, it appears to be that way.  Yes.

23       Q  Turning to the last page of Exhibit 5,

24   that lists what's called a "labor detail"; is that

25   right?
```

1          MS. SIELING:  Ob- --

2      Q  (By Ms. Kane)  And --

3          MS. SIELING:  Object to form.

4      **A  Yes.**

5      Q  (By Ms. Kane)  And then I guess I want to

6   ask that a different way.  Was the declaration

7   that you previously submitted in another case, was

8   that also related to research on the Dark Web?

9      **A  Yes.  It was related to that, but it was**

10  **also related to how a ransomware attack occurred**

11  **and things of that nature.**

12     Q  So the scope of that engagement was a

13  little bit broader?

14     **A  Very broad; very dense.**

15     Q  Besides the declaration that you've

16  submitted in the other case, have you previously

17  submitted any type of expert reports in any other

18  cases?

19     **A  Oh, I don't think so.**

20     Q  If you had, would that be something you'd

21  be able to find through searching your files?

22     **A  Yes, it would.  I -- I don't -- I don't**

23  **recall anything going into an ex- -- expert**

24  **report.**

25     Q  Does your declaration, Exhibit 2, contain

Page 50

1    all of the opinions that you are offering at this

2    stage?

3        A  Yes.

4        Q  To your knowledge, have you developed any

5    opinions in this case that you did not include in

6    your declaration?

7        A  No.

8        Q  So that's a, no, you have not developed

9    any opinions that are not included; right?

10       A  The only opinions I'm including are stated

11   in that report.

12       Q  I understand that you reviewed this report

13   in preparation for your deposition today.  Have

14   any of your opinions changed since issuing your

15   declaration?

16       A  No.

17       Q  Is there anything in your declaration that

18   you believe is inaccurate?

19       A  No.

20       Q  Is there any analysis missing from your

21   declaration?

22       A  Not to my knowledge; no.

23       Q  Are there any facts or evidence missing

24   from your declaration?

25           MS. SIELING:  Object to form.

1      A   No.

2      Q   (By Ms. Kane)   Is your declaration

3   incomplete in any respect?

4      **A   In my opinion, no.**

5      Q   If you are called to testify at a hearing

6   or trial in this matter, all of the opinions that

7   you would offer in this case are contained in your

8   declaration; correct?

9      **A   Yes.**

10         **THE WITNESS:   Could I get some more water?**

11         MS. KANE:   Let's go ahead and take a

12   break.

13         VIDEOGRAPHER:   Going off the record.

14   10:43 AM.

15         (Off the record.)

16         VIDEOGRAPHER:   Going on the record.   The

17   time is 10:58 AM.

18      Q   (By Ms. Kane)   Mr. Hardin, what was the

19   scope of your assignment in this case?

20      **A   The scope of our assignment in this case**

21   **was to research individuals on the Dark Web to see**

22   **if their information had been exposed.**

23      Q   Were you asked to do anything else?

24      **A   We were also asked to see if Flagstar was**

25   **out there as well.**

Page 52

1      Q   And when you say out there, what do you

2  mean?

3      A   I'm sorry.  Out on the Dark Web.

4      Q   So you were also asked to research

5  Flagstar to see if Flagstar's data was on the Dark

6  Web?

7      A   Yes.

8      Q   Could you explain what the Dark Web is?

9      A   Sure.  So the Dark Web, to access it, you

10  have to go out and acquire a special browser.

11  That browser is a Tor browser.  Tor stands for The

12  Onion Router.  It's a non-for-profit organization

13  that's out there.  Once you download the browser,

14  then from that perspective, you have to understand

15  where to go and what to do.  The Dark Web does not

16  have, like, a search engine per se.  There's lots

17  of different sites.  As long as you have what's

18  called "the onion link," that takes you out to a

19  site that you can go out to.

20          In our research, what we end up doing is

21  we go out and look at crime syndicates that we

22  know that are out there and others that allegedly

23  post data of victims.  We also go out to different

24  marketplaces that are out there and see if

25  information is out for sale associated with



Page 54

1    two major components to it.  One was researching

2    certain individuals to see if their information

3    was on the Dark Web; right?

4        A  Mm-hmm.

5        Q  Is that right?

6        A  Yes.

7        Q  And -- and the second component was to see

8    if Flagstar's data was on the Dark Web; is that

9    right?

10       A  That is correct.

11       Q  Were there any -- anything else that

12   you -- let me rephrase.  Was there anything else

13   that you were asked to do in the scope of this

14   assignment?

15       A  No.

16       Q  You mentioned that there are different

17   marketplaces on the Dark Web?

18       A  Mm-hmm.

19       Q  Could you sort of give me a bird's eye

20   view of how big the Dark Web is, what the scope of

21   it is?  Are there, you know, ten -- ten

22   marketplaces?  Are there an unlimited number?

23   Contacts you can provide would be helpful.

24           MS. SIELING:  Object to form.

25       A  Un- -- unlimited.  Un- -- unknown.

Page 55

1     Q   (By Ms. Kane)   So there are an unknown

2   unlimited number of marketplaces on the Dark Web?

3     A   Yes.   Marketplaces can come and go.   It

4   depends on the server that's up there.   For

5   example, Monopoly Market, a marketplace that's out

6   there that the FBI and Integral just recently took

7   down.   That marketplace was out there for about a

8   year before law enforcement was able to take it

9   down.

10     Q   And when we're talking about marketplaces,

11   do you mean, like, a specific website?

12     A   A specific onion link, yes.

13     Q   And I -- I noticed in your report you

14   reference what's called the "Surface Web"; right?

15     A   Mm-hmm.

16     Q   You also reference the Deep Web and the

17   Deep Dark Web.   Could you explain the difference

18   between those three -- what those three things

19   are?

20     A   Sure.   I think I outlined that in the

21   report here.

22     Q   And I guess let me rephrase the question,

23   Mr. Hardin.   Are -- the Surface Web, Deep Web, and

24   Deep Dark Web, are those all a component of the --

25   the Dark Web that we're talking about?

Page 58

1   of them might be down.  Again, it's just going to

2   depend if law enforcement has taken them down or

3   if the site administrator has decided to move the

4   respective link, and then that marketplace shows

5   up in another area.

6        Q   When you're referring to Exhibits B and C,

7   you're referring to Exhibits B and C of your

8   declaration that you've submitted in this case; is

9   that right?

10       A   Yes.

11       Q   So I want to take a look at both of those.

12   The first you mentioned, Exhibit C --

13       A   Yes.

14       Q   -- I'm going to turn to that.  And that's

15   Exhibit 2 in this case, but then it's Exhibit C to

16   that exhibit.  So you mentioned that this is a

17   list of different crime groups; is that right?

18       A   That -- that's correct; yes.

19       Q   And I see you -- you label them as "ecrime

20   forums" in the exhibit; is that right?

21       A   Yes.

22       Q   So from -- it looks like there are about

23   ▮▮▮ of these crime groups; right?

24       A   At -- at this time, yes.

25       Q   And are those -- there's -- there appears

1    themselves.  So, for example, Number 3, ▮▮▮▮▮▮

2    ▮▮▮▮▮ was the number one crime -- excuse me -- the

3    number one ecrime group for 2022.

4        Q   Mm-hmm.

5        A   They will be the same for 2023.  The

6    victims that have chosen not to pay are listed up

7    on their site.  So it will have the victim name

8    and potential information associated that they

9    have taken from them.

10       Q   Gotcha.

11       A   And that's the way it works for each one

12   of these.  And that's how they brand themselves.

13       Q   So each of these forums that you've listed

14   in Exhibit C, these are cites that the criminals

15   have created to post data or information for folks

16   who have not paid ransom; is that right?

17       A   That is correct.  Yes.

18       Q   And then you mentioned that this list

19   reflects the ecrime forums that existed I think at

20   the time you submitted your declaration; is that

21   right?

22       A   That is correct.

23       Q   Do you recall when you prepared this list?

24       A   Most likely in July.

25       Q   Okay.  And --



1      A  I think that's when -- if I go back to the

2  invoice that we have here on -- sorry --

3  Exhibit 7?  Did you call it seven?

4      Q  Yes.

5      A  Okay.  All right.  So on Exhibit 7, that

6  looks like when we were drafting all of this.  So

7  yes.

8      Q  So these ███ shame sites listed on

9  Exhibit C, those -- those may be different today;

10  right?

11     A  That is correct; yes.

12     Q  And they could've been different at the

13  time that the data incident occurred; is that

14  right?

15         MS. SIELING:  Object to form.

16     A  Yes.  Like, today, there's a -- a new

17  ecrime group that's shown up that's called

18  ████████████████████████████████████████

19  will not be on this list because that crime group

20  just formed about ten days ago.

21     Q  (By Ms. Kane)  Since you've submitted your

22  declaration, you have not gone back and updated

23  this list; is that right?

24     A  That is correct.

25     Q  Since you submitted your declaration, you

Case 4:22-cv-11385-SDK-KGA  ECF No. 72-6, PageID.1671  Filed 03/06/24  Page 13 of 84
Highly Confidential                    William Hardin                    November 16, 2023

Page 62

1    have not gone back and looked at these various

2    shame sites to identify whether Flagstar's data

3    was located on them; right?

4        A  No, I have not.

5        Q  And since you've submitted your

6    declaration, you haven't gone back through the

7    shame sites, the ██ shame sites, to identify

8    whether or not any certain individual's

9    information was posted on them; is that right?

10       A  That is not correct.  I go out to these

11   shame sites, depending on who my client is, to

12   look for individual information associated with

13   them.

14       Q  Okay.  Well --

15       A  If you're asking me specifically have I

16   gone back and looked at these shame sites with

17   this declaration, the answer is no, I have not.

18       Q  Let me ask you this.  Since you submitted

19   your declaration in July of --

20       A  Mm-hmm.

21       Q  -- 2023 --

22       A  Yes.

23       Q  -- have you gone back onto each of these

24   shame sites to determine whether or not John Scott

25   Smith's information was found on them?

Page 63

1      A  Oh, no, I have not.

2      Q  And since you submitted your declaration

3   in July of 2023, have you gone back onto any of

4   these shame sites to determine whether or not

5   Flagstar's data is on them?

6      A  No, I have not.

7      Q  Since you submitted your declaration in

8   July of 2023, have you gone back to search to see

9   whether or not each of these shame sites still

10  exists?

11     A  Yes.

12     Q  And what did you find?

13     A  Some of them are no longer there.  Other

14  ones have proliferated.  So we have new ones that

15  have come, and we've had others that the onion

16  link no longer works.

17     Q  Do you have an updated list of the shame

18  sites that are currently active?

19     A  Do I have an updated list of shame sites

20  that are currently active?

21     Q  Yes.

22     A  Yes, I do.

23     Q  Zooming out a little bit, is this list of

24  shame sites that's in Exhibit C to your

25  declaration, is this a list that reflects all of

Page 64

1    the shame sites that you and CRA had access to as

2    of the time you submitted your declaration?

3        **A   Yes.   On the ecrime forums, yes.**

4        Q   How did you and CRA identify this list of

5    shame sites for use in your declaration?

6        **A   Multiple different ways.**

7        Q   Could you explain?

8    ████████████████████████████████████

████████████████████████████████████████

████████████████████████████████

11       Q   Mm-hmm.

12   ████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

████████████████

16       Q   Mm-hmm.

17   ████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████

20       Q   Okay.

21   ████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████

4      Q   Do you know as of the time that you

5   submitted your declaration in July of 2023 how

6   many shame sites existed on the Dark Web?

7      **A   At the time from our research and**

8   **understanding, there were roughly about ██ , and**

9   **that's the number that we have here.**

10      Q   Are you offering the opinion today that

11   these ██ shame sites are the only shame sites that

12   exist on the Dark Web?

13      MS. SIELING:   Object to form.

14      **A   Can you rephrase that question?**

15      Q   (By Ms. Kane)   Sure.   Is it your

16   understanding that the ██ shame sites you have

17   list -- you have listed in Exhibit 3 -- or excuse

18   me.   Let me rephrase.

19      Is it your understanding that the ██ shame

20   sites listed in Exhibit C to your declaration are

21   the only shame sites that existed on the Dark Web

22   as of July of 2023?

23      **A   Those are the ones that CRA monitors.   I**

24   **don't know if there's any other ones out there.**

25      Q   So you don't know whether or not there are

888-893-3767      Lexitas operates in all 50 states and is licensed where required Nevada Registration #116F.
www.lexitaslegal.com

LEXITAS

Page 66

1    additional shame sites that exist on the Dark Web

2    as of July 2023 other than the ▮ that you've

3    listed here; right?

4           MS. SIELING:  Object to form.

5      **A  You're asking me that as of today or as of**

6    **that particular moment?**

7      Q  (By Ms. Kane)  Let me rephrase.  As of

8    July of 2023 when you submitted your declaration,

9    you only submitted in Exhibit C the shame sites

10   that CRA was aware of; right?

11     **A  That is correct.  Yes.**

12     Q  There may be shame sites that CRA is not

13   aware of; right?

14          MS. SIELING:  Object to form.

15     **A  Very low likelihood.  But could it be a**

16   **possibility?  Sure.**

17     Q  (By Ms. Kane)  So as of July of 2023 when

18   you've submitted your declaration, it's possible

19   that there were existing shame sites that you and

20   your staff were not aware of; right?

21          MS. SIELING:  Object to form.

22     **A  From a major crime syndicate perspective,**

23   **we've captured -- we've monitored and captured, I**

24   **would say, the vast majority of shame sites that**

25   **are out there.**

Page 67

1    Q   (By Ms. Kane)   You say the vast majority,

2    but you can't guarantee that you've captured all

3    of the shame sites that existed as of July 2023 in

4    Exhibit C to your declaration, can you?

5         MS. SIELING:   Object to form.

6    A   No, I cannot.

7    Q   (By Ms. Kane)   And that's, again, because

8    the Dark Web is so large in scope; correct?

9         MS. SIELING:   Object to form.

10   A   That -- that is correct.

11   Q   (By Ms. Kane)   And you rely on research

12   and work that you do to identify these shame

13   sites; right?

14   A   Yes.

15   Q   You mentioned that these shame sites can

16   be removed from the Dark Web --

17   A   Mm-hmm.

18   Q   -- and change links; right?

19   A   Yes.

20   Q   So do you know if the -- if any of these

21   shame sites that are listed in Exhibit C to your

22   declaration exists but are at different links now?

23   A   Most likely, yes.   I'd have to go back

24   through this entire onion link, see if they

25   resolute or not.   And if they have an updated

Page 69

```
 1   back on.

 2         MS. KANE:  Let's go off the record for a

 3   moment.

 4         VIDEOGRAPHER:  Off the record at 11:17 AM.

 5         (Off the record.)

 6         VIDEOGRAPHER:  Going on the record

 7   11:18 AM.

 8      Q  (By Ms. Kane)  Mr. Hardin, with respect to

 9   the shame sites you have listed in Exhibit C to

10   your declaration, I understand you've stated that

11   criminals will use these sites to post the data of

12   individuals or companies that do not pay ransom;

13   right?

14      A  That is correct.  Yes.

15      Q  And the purpose is to shame those

16   individuals for not paying ransom; right?

17         MS. SIELING:  Object to form.

18      A  Yes.

19      Q  (By Ms. Kane)  Are these forums, in your

20   experience, used for any other purpose?

21      A  No.  It's -- it's mostly in the aspect to

22   demonstrate if you choose not to pay or kind of

23   what we call "play their game," then they will

24   victimize you in this way, in other ways that they

25   have as well.
```

Page 70

1    Q  So these forums that are listed in

2  Exhibit C to your declaration, they're only used

3  to shame individuals who have not paid a ransom?

4    **A  Yes.  That and post the information**

5  **associated with the victim organization.**

6    Q  If an organization had paid a ransom,

7  then, you would not expect that organization's

8  data to show up on a shame site; right?

9    **A  That is correct.**

10    Q  And you mentioned Exhibit B to your

11  declaration?

12    **A  Yes.**

13    Q  You stated that Exhibit B reflects

14  marketplaces; is that correct?

15    **A  That -- that's correct.**

16    Q  So these marketplaces are different than

17  shame sites that are in Exhibit C; is that right?

18    **A  That is correct.  Yes.**

19    Q  How are they different?

20    **A  So in Exhibit C, that information that's**

21  **out there is related to that particular ecrime**

22  **group.  Typically, they don't sell data out there.**

23  **They post the data, and then individuals can**

24  **download it.**

25        **Now, there are some ecrime groups that are**

Page 73

1 don't sell that data there.  Out here, like, for

2 example, if I went out to the ▇▇▇▇ market, on

3 Number 27, I could find a seller out there that

4 could have VPN credentials.  And then once I buy

5 those credentials and validate them, then I could

6 launch an attack.  So we have seen in our research

7 and, basically, ecrime forums will use

8 marketplaces to buy certain information in order

9 to attack victims.

10  Q  So these marketplaces that are in

11 Exhibit B, these are some of the websites that

12 threat actors or criminals would use to buy and

13 sell information --

14  A  Yes.

15  Q  -- that's exposed from data breaches, for

16 example; right?

17   MS. SIELING:  Object -- object to form.

18  A  Yes.  Yes, they can.

19  Q  (By Ms. Kane)  And you mentioned that

20 there are an unlimited number of marketplaces on

21 the Dark Web?

22  A  Mm-hmm.  Yep.

23  Q  Here you only have listed ▇, is that

24 right, or ▇?

25  A  Sorry.  Hold on.  ▇▇▇  Yes.

Page 74

1    Q   How did you identify these ▉?

2    A   Through our research that we do and

3  understanding the proliferation of criminal

4  networks and how they buy and sell goods.  What

5  are the most popular forums that out there --

6    Q   Mm-hmm.

7    A   -- and where is the kind of what we call

8  the trust economy at?

9    Q   Mm-hmm.

10    A   Again, remember, criminals rip off

11  criminals on a daily basis.

12    Q   Mm-hmm.

13    A   So these types of forums that are set up

14  are in the aspect of, now, I have someone that has

15  goods for sale.  Where -- which marketplace do I

16  trust in order to make a sell?

17    Q   Mm-hmm.

18    A   It's all financial aspects.

19    Q   These ▉ forums that you have listed on

20  Exhibit B, those are only a fraction of the forums

21  that exist on the Dark Web --

22        MS. SIELING:  Object to form.

23    Q   (By Ms. Kane)  -- is that right?

24    A   That's correct.  Yes.

25    Q   The links for these forums on Exhibit B,

1  are they variable?  Do they change?  Can they be

2  removed?  Replaced?

3       MS. SIELING:  Object to form.

4    A  Yes, they can.  Marketplaces come and go.

5  Earlier, I talked about Monopoly Market and the

6  FBI taking them down.  So once different forums

7  see law enforcement rating, they have to make sure

8  that their site is kind of what we call

9  "bulletproof."

10   Q  Mm-hmm.

11    A  And then the other thing is if they have

12  any inclination that they think they're going to

13  get taken down, they'll move that marketplace to

14  another server so then in turn that the

15  marketplace can be up and going.

16   Q  This list of forums on Exhibit B to your

17  declaration, this is a list of forums that CRA had

18  access to as of the time you submitted your

19  declaration in July of 2023; is that right?

20    A  That is correct.  Yes.

21   Q  Since you submitted your declaration in

22  July of 2023, have you updated this list?

23    A  Yes.

24   Q  Does CRA have access to more forums and

25  marketplaces than it -- now than it did in July of

1    2023?

2        A  Most likely, yes, but I'd have to go back

3    and reconcile to see what our updated lists are.

4        Q  Is it your understanding that any of these

5    marketplaces have been take- -- that are listed in

6    Exhibit B have been taken down or removed since

7    July of 2023?

8        A  I would have to go and reconcile the list

9    to see what's happened.

10       Q  Since you've submitted your declaration in

11   July of 2023, you have not gone back through each

12   of these forums in Exhibit B to see if John Scott

13   Smith's information was on any of these forums;

14   have you?

15       A  No.

16       Q  And since you submitted your declaration

17   in July of 2023, you have not gone back through

18   the list -- in Exhibit B, you haven't gone back

19   through those forums to identify whether or not

20   Flagstar's data is in any of those forums; right?

21       A  That is correct.  Yes.

22       Q  You have not gone through any new or

23   additional forums to see if Flagstar's data is

24   listed on those forums since you've submitted your

25   declaration in July of 2023?

1       A   That is correct.  Yes.

2       Q   Can you explain -- well, let me ask you

3   this.  As part of your work for CRA, do you keep

4   these lists that are in Exhibit B and Exhibit C as

5   a matter of course that you consult in your work

6   for various matters?

7       A   Yes.

8       Q   Who is responsible for updating these

9   lists?

10      A   Multiple people.

11      Q   Is Matt Ahrens one of them?

12      A   Yes.

13      Q   Is Jesse Burke?

14      A   Yes.

15      Q   Are you responsible for updating them as

16  well?

17      A   Yes.

18      Q   How often would you say these lists in

19  Exhibits B and C are updated?

20      A   Probably once we get new information.  For

21  example, ████████████████████ just came online,

22  so that's a new crime group that's out there.  So

23  I've updated our list of ecrime forums.  So new

24  groups comes up.  If a group comes down, we market

25  there.  If it changes an onion link, we update it

1    called a listing of information that they have

2    taken.

3            And if you remember, back in school, the

4    old Venn diagram, we take circle A, which is our

5    forensics, circle B, which is like threat actor

6    information, and mirror those two together and,

7    hopefully, that they will align.  So when I talk

8    about quantify the risk of exposure, that's what

9    we're talking about there.

10   Q  You were not asked to perform that type of

11   work in this case; is that right?

12   A  No, I was not.

13   Q  In performing your work for this case,

14   were you asked to make any assumptions about the

15   facts or the evidence?

16   A  No.

17   Q  Can you explain what opinions you are

18   offering in this case?

19   A  ███████████████████████████████████████

     ███████████████████████████████████████

     ████████████████████

22   Q  Please explain that opinion.

23   ████████████████████████████████████

     ███████████████████████████████████████████

     ███████████████████████████████████████████

Highly Confidential                     William Hardin                    November 16, 2023

Page 88

&#9608;&#9608;&#9608;&#9608;&#9608;&#9608;&#9608;&#9608;&#9608;&#9608;&#9608;&#9608;&#9608;&#9608;&#9608;&#9608; So that's

11    an opinion that we're forming.

12        Q  Are you offering any other opinions in

13    this matter?

14        A  Our other opinion, I guess that we're

15    offering, is that the information associated with

16    Flagstar was not posted out on any known shame

17    sites associated with this particular event.

18        Q  Are you offering any other opinions in

19    this matter?

20        A  I -- I don't believe so.

1    Q  ██████████████████?

2    A  Yes.

3   ██████████████████████████████████

██████████████████████████████

5    A  Mm-hmm.

6    Q  Were you asked to render an opinion about

7  the correlation between those two cyber groups?

8    A  No.  We -- we provided that based off our

9  research that we've performed.

10    Q  Why did you provide that opinion?

11    A  Because it provides context more than

12  anything.  The way crime forums work, sometimes

13  you have affiliates or other crime groups that

14  moderate certain forums.  So if you can understand

15  the psyche of -- of your adversary, that allows

16  you to understand are they following kind of what

17  we call the pirates code that's out there?

18    Q  What do you mean by "the pirates code"?

19    A  So the pirates code is when you make a

20  ransom payment, will the obligations be fulfilled?

21  For example, will they provide a decryption key?

22  Will they destroy the information that is in their

23  possession?  Will they give you a security report?

24  Will they not list you on their shame site?  Will

25  they not attack you again?  So depending on what

Highly Confidential                    William Hardin                    November 16, 2023

1    you provide to them, hence, your terms and

2    conditions, will the adversary, or the crime

3    group, follow through in those conditions?

LEXITAS



When did you perform those

12   engagements if you can recall?

13       A  I'd have to go back and see all the

14   different dates.

15       Q  Do you think it was -- each of those

16   engagements was within the last five years?

17       A  Oh, yes.  Yes.

18       Q  Within the last year?

19       A  This is 2023 right now; right?  Within the

20   last year?  I'd have to go back and take a look,

21   potentially.

22       Q  Within the past two years probably?

23       A  Yes.  Yes.  Definitely within the last

24   two.

25       Q  So each of the engagements that you've

Page 93

1    information on shame sites; is that right?

2        A   That is correct.

3        Q   Okay.  Can you explain to me for each of

4    those matters on what the general circumstances

5    were of the negotiations with the threat actor and

6    the ransom payment?

7            MS. SIELING:  Object to form.

8        Q   (By Ms. Kane)  Let me rephrase.

9        A   Okay.

10       Q   So you're stating that you recall handling

11   a number of matters, including Shao, and you're

12   relying on your previous experience with Shao as a

13   basis for your opinion in this case; is that

14   right?

15       A   I think what I'm doing is related to that

16   but also all ransom cases that I have performed.

17       Q   Sure.  But specific to Shao, are -- you

18   mentioned that the identity of the threat actor is

19   relevant because it, you know, helps provide color

20   to whether or not the threat actor will follow the

21   pirates code; is that right?

22       A   That -- that -- yes.

23       Q   And in your experience with Shao

24   specifically, you believe that the matters that

25   you've worked on have indicated that Shao follows

 1    the pirates code; is that right?

 2        A  Yes.  I would say that's correct.

 3        Q  Okay.  But can you give me any specifics

 4    of what those matters were?

 5        A  I'd have to go back and look at the cases

 6    and then refresh myself on them.

 7        Q  So as you sit here today, you cannot

 8    provide us the details of your experience with

 9    Shao; is that right?

10        MS. SIELING:  Object to form.

11        A  I would say with Shao specifically, I'd

12    have to go back and look at my client files to see

13    exactly what happened.

14        Q  (By Ms. Kane)  You've handled cases

15    involving ransomware in which Shao has not been

16    the threat actor; right?

17        A  That is correct.  Yes.

18        Q  So in your experience negotiating

19    ransomware cases, are there threat actors or

20    threat actor groups that don't follow the pirates

21    code?

22        A  Not that I'm aware of.

23        Q  So in the ransomware cases that you've

24    negotiated, would you say that every ransomware

25    group that -- well, let me rephrase.  You've

William Hardin

Page 100

20     Q  Okay.  So --

21     A  And we did not find anything associated

22  with Flagstar.

Page 101





24     Q   Do you have a list of these search terms

25   that you used or your staff used to search these



1   marketplaces?

2       A   I'd have to go back and look.

3       Q   Is that something -- is -- a list of the

4   various search terms you used across these

5   marketplaces, is that something that you would've

6   kept in the normal course of your business?

7       A   It depends.

8       Q   Okay.  Do you have any idea if you kept

9   that type of list in this case?

10      A   I don't recall.

11      Q   Did you direct your employees, Mr. Burke

12  or Mr. -- your partner, Mr. Ahrens, did you direct

13  them to keep a list of the searches that they

14  performed on these marketplace search engines?

15      A   Keep a list of the searches.  Do you mean

16  the -- what they found?

17      Q   The search terms used.

18      A   Oh, the terms?  I don't recall.

19      Q   Did you provide any direction to Mr. Burke

20  or Mr. Ahrens regarding what search terms they

21  should use across these search engines on the

22  marketplace?

23      A   No.  Both of them are skilled operators.

24  So when we have a task associated with us, you

25  know, it's up to them to determine exactly how



Highly Confidential                    William Hardin                    November 16, 2023

Page 105

 1    they want to hunt and find information.

████████████████████████████████████████████

████████████████████████████████████

███████████████████

███████████████████████

████████████████████

███████████████████████████████████████████

██████████████

█████████████████████

█████████████████████

████████████████████████████████

12       Q  How would you use the result of a search

13    term?

**14       A  It's pretty expansive; isn't it?**

15       Q  Right.  How --

**16       A  Yeah.**

17       Q  Yeah.  Can you explain to me how you

18    would've used that search term to identify whether

19    or not any Flagstar data was on a marketplace?

████████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

William Hardin









14　　Q  Can you tell us which marketplaces have

15　of your declaration.

14　　Q  Can you tell us which marketplaces have

15　have that -- have the ability to engage in that way

16　or -- and what marketplaces are just forums that

17　are set up?

18　　**A  Do you want me to go through the whole**

19　**list?  It's a long process.**

20　　Q  Well, let's turn to Exhibit B for a second

21　of your declaration.

22　　**A  Sure.**

23　　Q  So if I'm understanding correctly, you're

24　sort of making a distinction between two different

25　types of marketplaces.  One is a place where

1    either passing information along or they're trying

2    to capitalize on the information and try to sell

3    the data.

4        Q   So some marketplaces are more like Amazon

5    where it's people interested in selling or

6    purchasing the data go on to the forum and

7    purchase it, sell it, without much engagement; is

8    that right?

9            MS. SIELING:   Object to form.

10       A   That -- that -- that's correct.   Yes.

11       Q   (By Ms. Kane)   And then some of these

12   Exhibit B marketplaces are more like eBay where

13   you can negotiate or discuss pricing --

14       A   Yes.

15       Q   -- or various assets of the deal with the

16   threat actor; is that right?

17       A   That's correct.

18       Q   Okay.   For the -- for the marketplaces

19   that are more like Amazon --

20       A   Mm-hmm.

21       Q   -- for those marketplaces, when you were

22   searching for Flagstar's data, would you just

23   search -- use the search engine that was available

24   on that marketplace to identify whether or not

25   Flagstar's data was available?

Page 112

```
1        A  If -- if available, yes.  If not, then

2   it's going through forums and things of that

3   nature that are out there to determine, like,

4   who's trying to move what where, what's the

5   history of that person that's there.

6        Q  Did CRA keep any sort of record of how you

7   and your staff conducted this analysis of the

8   Exhibit B marketplaces?

9        A  When you say record, help me out.  What is

10  that?

11       Q  Is there any document or material that we

12  could consult to see how you analyzed these

13  various marketplaces to identify whether or not

14  Flagstar's data was actually present on those

15  marketplaces?

16       A  No, there's no written documentation or

17  things of that nature.

18       Q  Turning back to your declaration, if you

19  would, turn to Page 6.

20       A  Sure.

21       Q  Wait.  Turn to Page 7.

22       A  Okay.

23       Q  So Paragraph 24 --

24       A  Mm-hmm.

25       Q  -- states that CRA searched for Flagstar
```

Highly Confidential                    William Hardin                    November 16, 2023

Page 115

1      Q  Because Flagstar paid a ransom, you would

2  not expect for Flagstar's data to be posted on a

3  shame site; right?

4          MS. SIELING:  Object to form.

5      A  That is correct.  Yes.  According to the

6  pirates code and reading the communications

7  associated with -- that I was provided and in

8  addition doing all of your searching, we did not

9  see that information out there, but we did find it

10  associated with own Clop.  And it's my

11  understanding that Flagstar was part of the

12  Accellion breach that occurred along with numerous

13  other victims that Clop posted up.

14      Q  Your analysis in this case regarding

15  whether Flagstar's data was located on the Dark

16  Web --

17      A  Mm-hmm.

18      Q  -- was limited to October 28th, 2022, to

19  November 14th, 2022; is that right?

20          MS. SIELING:  Object to form.

21      A  That's correct.  That's -- that's where we

22  searched for the information during that time

23  window.

24      Q  (By Ms. Kane)  CRA only searched for

25  whether or not Flagstar's data was available on

Highly Confidential                    William Hardin                    November 16, 2023

1   these ▮ marketplaces between October 28th, 2022,

2   and November 14th, 2022; right?

3        MS. SIELING:  Object to form.

4     A  That is correct.  Yes.

5     Q  (By Ms. Kane)  So if data related to the

6   data breach was posted and then removed prior to

7   October 28th, 2022, you would not have found it;

8   is that right?

9        MS. SIELING:  Object to form.

10    A  If it was posted and -- clarify your

11  question, please.

12    Q  (By Ms. Kane)  Sure.  If a threat actor

13  had posted data related to the data breach prior

14  to October 20th, '22, and removed it before

15  October 28th, 2022, you would not have found that

16  data in your search?

17       MS. SIELING:  Objection.  Hypothetical.

18  Calls for speculation.

19    Q  (By Ms. Kane)  You can answer.

20       THE WITNESS:  Do I answer?

21       MS. SIELING:  You can answer --

22       THE WITNESS:  Oh.

23       MS. SIELING:  -- if you can.

24    A  Okay.  Sorry.  Can you ask it again?

25    Q  (By Ms. Kane)  If a threat actor had

Page 120

1    speculation.  Asked and answered.

2        A  Again, I -- I just have to clarify it.

3    The way that you're asking the question is if the

4    data had been posted.  My answer is the data would

5    not have been posted because a ransom had been

6    paid.

7            Hypothetically, if a ransom had not been

8    paid and the threat actor did post the data and

9    subsequently removed that information, then, yes,

10   I would not have been able to find anything

11   because our searches would've been through

12   October 28th to November 14th.

13       Q  Your searches would only find data that

14   was available on the Dark Web on those ███

15   marketplaces that was available between

16   October 28th, 2022, and November 14th, 2022?

17           MS. SIELING:  Object to form.

18   Misstates --

19       A  That -- that is our search period of where

20   we looked for information, yes.

21       Q  (By Ms. Kane)  So if data was posted after

22   November 14th, 2022, to any of those marketplaces,

23   your analysis would not have included that data;

24   right?

25           MS. SIELING:  Object to form.  Calls for

Page 121

1  speculation.

2     A   That is correct because we have not

3  searched for anything since that date.

4     Q   (By Ms. Kane)  And your search across the

5  ▮▮▮▮ shame sites was limited to October 28th, 20- --

6  2022, to November 14th, 2022; is that right?

7     A   That is our search period, yes.

8     Q   So if any data was posted after

9  November 14th, 2022, to those shame sites, your

10  analysis would not have included or considered

11  that information; is that right?

12        MS. SIELING:  Object to form.

13     A   That -- that's correct.  Yes.

14     Q   (By Ms. Kane)  And if any information had

15  been posted to those shame sites before

16  October 28th, 2022, and then removed, your

17  analysis would not have captured that information;

18  is that right?

19        MS. SIELING:  Object to form.  What do you

20  mean by information?

21     Q   (By Ms. Kane)  Let me rephrase.  If data

22  had been posted on shame sites related to the

23  Flagstar data breach before October 28th, 2022,

24  and then removed before October 28th, 2022, your

25  analysis would not have picked up if that data was

Page 132

1    your opinion that generally speaking, the payment

2    of a ransom guarantees that a -- that the stolen

3    data will not be posted on the Dark Web?

4         MS. SIELING:  Object to form.

5       **A  In my opinion, based off all the cases**

6    **I've worked on, when payment has been made,**

7    **information has not been leaked.**

8       Q  (By Ms. Kane)  Are you familiar with the

9    joint Cybersecurity & Infrastructure Security

10   Agency?

11      **A  No, I am not.**

12      Q  You're not familiar with that group?

13      **A  No.  Would you like to refresh me?**

14      Q  I'm going to hand you what I will mark as

15   Exhibit 8.  Go ahead take a look at that.

16      **A  Okay.**

17      Q  I don't need you to review that, and you

18   can take your time, but I'm going to be asking you

19   about one specific piece of that.  Just take a

20   look at it generally.

21      **A  Sure.  Okay.**

22      Q  So this is what's called -- on the front

23   page, it says it's a Stop Ransomware Guide; is

24   that right?

25      **A  Yes.**

1      Q   And it --

2      A   That's what it says on the document.

3      Q   -- it looks like it was published

4   October 2023 --

5          MS. SIELING:   Object to form.

6      Q   (By Ms. Kane) -- is that right?

7      A   Yes.

8      Q   Have you ever seen this document before?

9      A   First time.

10     Q   Okay.  If you go to Page 3 of the

11   document --

12     A   Mm-hmm.

13     Q   -- if you go to the bottom of the page,

14   the last paragraph that starts with "These

15   ransomware and data extortion"; do you see that?

16     A   Where again?

17     Q   The bottom of the page of the last

18   paragraph says, "These ransomware and data

19   extortion prevention and response best practices."

20   Do you see that paragraph?

21     A   Yes, I do.

22     Q   Okay.

23     A   Yeah.

24     Q   It goes on to say "These ransomware and

25   data extortion prevention and response best

888-893-3767          Lexitas operates in all 50 states and is licensed where required Nevada Registration #116F.
www.lexitaslegal.com

LEXITAS

1  practices and recommendations are based on

2  operational insights from CISA, MS-ICAC [sic] --

3      **A  Mm-hmm.**

4      Q  -- the National Security Agency (NSA), and

5  the Federal Bureau of Investigation (FBI),

6  hereafter referred to as the authoring

7  organizations."  Did I read that correctly?

8      **A  Yes, you did.**

9      Q  Okay.  So do you have an understanding of

10  what the CISA is?

11     **A  Well, there's a bunch of different**

12  **definitions of what CISA is.  But according to**

13  **your document, it's the joint Cybersecurity &**

14  **Infrastructure Security Agency.**

15     Q  Are you familiar with that agency?

16     **A  I don't believe so.**

17     Q  Are you familiar with the NSA?

18     **A  Yes.**

19     Q  Are you familiar with the FBI?

20     **A  Yes.**

21     Q  Are those organizations that, from your

22  understanding, have knowledge and provide guidance

23  on how to respond to ransomware and data extortion

24  events?

25         MS. SIELING:  Object to form.

1      **A   Depending on the victim, yes.**

2      Q   (By Ms. Kane)   And does this appear -- I

3   mean, this appears to you to be some sort of guide

4   authored by those agencies regarding ransomware

5   and data extortion prevention and response best

6   practices and recommendations; is that right?

7          MS. SIELING:   Object to form.

8      **A   That's what the document says.   I can't --**

9   **I have -- haven't read it, so I can't give you an**

10  **opinion on it.**

11     Q   (By Ms. Kane)   Now, I want to turn on this

12  to Page 21.

13     **A   Okay.**

14     Q   There's a box on that page starting with

15  "The authoring organizations"; right?

16     **A   Yes.**

17     Q   So if you sort of cross-check that back

18  with the Page 3 we were just on --

19     **A   Okay.**

20     Q   -- it defines the authoring organizations

21  as the CS- -- CISA, MS-ISAC, NSA, and FBI.

22     **A   Mm-hmm.**

23     Q   Do you recall that?

24     **A   Yes.**

25     Q   This box on Page 21 of Exhibit 8 says,

Page 136

1    "The authoring organizations do not recommend

2    paying ransom."  Did I read that correctly?

3        **A  That is correct.**

4        Q   It says, "Paying ransom will not ensure

5    your data is decrypted, that your systems or data

6    will no longer be compromised, or that your data

7    will not be leaked."  Did I read that correctly?

8        **A  Yes, you did.**

9        Q   Do you disagree with this guidance?

10       MS. SIELING:  Object to form.

11       **A   It's not that I disagree with that**

12   **guidance.  It's that the problem with that**

13   **guidance is it's a business decision.  Law**

14   **enforcement will come out and say they don't want**

15   **to do it because you're enabling this ecosystem.**

16   **The business has to make a decision if they're**

17   **going to move forward with a payment.**

18       Q   (By Ms. Kane)  Mr. Hardin, do you agree

19   with the statement made in this ransomware guide

20   that paying ransom will not ensure your data is

21   decrypted?

22       MS. SIELING:  Object to form.

23       Q   (By Ms. Kane)  Yes or no?

24       **A   Paying ransom will not ensure your data is**

25   **decrypted.  Well, I disagree with that on the**

1   basis of before any ransom is payment, normally,

2   you will test to make sure that the keys will

3   work.

4       Q  So, Mr. Hardin, you disagree with that

5   statement?

6       A  Paying ransom will not ensure your data is

7   decrypted?  Yes, I disagree with that statement.

8       Q  Do you agree with the statement that

9   paying ransom will not ensure that your systems or

10  data will no longer be compromised?

11          MS. SIELING:  Object to form.

12      A  I disagree with that statement as well.

13      Q  (By Ms. Kane)  And you also disagree with

14  the statement that paying a ransom will not ensure

15  that your data will not be leaked?

16      A  Based off of that statement and my

17  experience, yes, I disagree with it.

18      Q  So you're offering the opinion in today's

19  case that the ransom payment ensured that the data

20  would not be posted on the Dark Web --

21          MS. SIELING:  Objection.

22      Q  (By Ms. Kane) -- is that right?

23      A  In the cases that I have handled and the

24  payments that I -- have been made, the data of my

25  clients has not been leaked out on the Dark Web.

Page 144

```
1    and the negotiator; right?

2       A   Correct.

3       Q   You did not -- you were not a part of the

4    negotiation with the threat actor; right?

5       A   No, I did not handle this negotiation.

6       Q   You don't have any personal knowledge

7    of -- other than the documents that you reviewed,

8    you don't have any personal knowledge of the

9    negotiations with the threat actor in this case;

10   right?

11      A   No, I do not.

12      Q   Okay.  The only documents you've seen

13   related to the terms of the agreement are

14   documents that were provided to you by Flagstar's

15   counsel; is that right?

16      A   That is correct.

17      Q   Now, these terms of the agreement that you

18   listed in Paragraph 14, they include, like we've

19   discussed, access provided to Flagstar to delete

20   the data; right?

21      A   Yes.

22      Q   But they also -- these terms also include

23   other things too; right?

24      A   Yes.

25      Q   They include a promise by the threat actor
```

1    Q  (By Ms. Kane)  Okay.  Well, let me ask you

2    this.  Well, you say "most likely."  What do you

3    mean by that?

4       **A  Well, it's most likely.**

5       Q  I mean, couldn't the threat actor take the

6    data and just sell it on the Dark Web and make

7    money?

8           MS. SIELING:  Object to form.

9    Hypothetical.

10      **A  What forum would he sell it on?**

11      Q  (By Ms. Kane)  You tell -- any forum.  You

12   tell me.

13          MS. SIELING:  Object to form.

14      **A  So in an -- in an ecosystem perspective,**

15   **again, brand is everything.**

16      Q  (By Ms. Kane)  Well, let me ask you this.

17   Is it possible for the threat actor to sell data

18   anonymously?

19          MS. SIELING:  Object to form.

20      **A  Can a threat actor sell data anonymously?**

21   **Of course, they can.  They -- they can set up a**

22   **various different handle, and from that**

23   **perspective, they can advertise information that**

24   **they have for sale.**

25      Q  (By Ms. Kane)  So a threat actor could

1    take stolen data, sell it under a different alias;

2    right?

3          MS. SIELING:  Object to form.

4    Hypothetical.

5       **A   In a theoretical world, yes, that could**

6    **occur.**

7       Q   (By Ms. Kane)  They could sell it under a

8    different alias without risking their reputation?

9          MS. SIELING:  Object to form.

10   Hypothetical.

11      **A   Depending on the forum that they're in,**

12   **likely not.**

13      Q   (By Ms. Kane)  So in a circumstance, okay,

14   that a threat actor is paid a ransom for stolen

15   data but hold on to that data or wants to try to

16   make more money off of that data --

17      **A   Okay.**

18      Q   -- okay?

19      **A   Yeah.**

20      Q   They could take that stolen data and sell

21   it in pieces on the Dark Web; right?

22         MS. SIELING:  Object to form.

23      **A   Depending on what the data is, they could,**

24   **but that -- all that takes time.  If you've taken**

25   **two terabytes of information, you have to then**

1    decipher what data you have.  It could be

2    structured data, unstructured data, images, PDFs.

3    The list goes on and on.  And then the question's

4    going to be if you have a buyer out there, what

5    are they buying?

6        Q  (By Ms. Kane)  So let's focus on the type

7    of data that was at issue in this case.  Okay.  Do

8    you have an understanding of what type of data was

9    stolen from Flagstar in this data -- in this cyber

10   incident?

11       A  I do not.

12       Q  Are social security numbers a valuable

13   commodity on the Dark -- on the Dark Web?

14          MS. SIELING:  Object to form.

15       A  No.

16       Q  (By Ms. Kane)  Your opinion is that social

17   security numbers have no value on the Dark Web?

18          MS. SIELING:  Object to form.  That's not

19   what he said.

20       A  Social security numbers can sell anywhere

21   between 10 cents to $3 on the Dark Web depending

22   on the forum that you're on.  In addition to that,

23   depending on the reams of SSNs that you buy, it

24   can also reduce the price.

25       Q  Okay.  And what's your --

1    time that you've -- well, in 2021, late 2021,

2    early 2022, are you aware what -- of what

3    marketplaces Shao operated on, if any?

4        **A  Yes.**

5        Q  What marketplaces were those?

██████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████████████

█████████████████████████████████████

10       Q  Do you know if during the time of the data

11   breach Shao was active on marketplaces that are

12   not included in the list that you gave in

13   Exhibit B?

14       **A  They potentially could have,**

15   **hypothetically.  Yes.**

16       Q  And in your analysis in this case, you

17   only checked the marketplaces that are listed in

18   Exhibit B; is that right?

19       MS. SIELING:  Object to form.

20       **A  Those are the marketplaces that we**

21   **checked.**

22       Q  (By Ms. Kane) ██████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████

Case 4:22-cv-11385-SDK-KGA   ECF No. 72-6, PageID.1718   Filed 03/06/24   Page 60 of 84
Highly Confidential                    William Hardin                    November 16, 2023

Page 180

16          MS. SIELING:  Object to form.

24     Q  You, again, don't know the individual

25  actors that made up that group; right?



 1      A  No, I do not.

 2      Q  So those actors could've reorganized into

 3   different grounds; right?

 4          MS. SIELING:  Objection.  Hypothetical.

 5      A  When you say "different groups," are you

 6   talking about going to different crime syndicates?

 7      Q  (By Ms. Kane)  They could have created a

 8   different crime syndicate, gone to other crime

 9   syndicates.  You just don't know; is that right?

10          MS. SIELING:  Objection.  Calls for

11   speculation.

12      A  That is correct.  I do not know.

13      Q  (By Ms. Kane)  You don't know if that

14   crime -- the Shao ransom group still exists in the

15   same form it did back in December of 2021; right?

16          MS. SIELING:  Object to form.

17      A  No, I do not.

18      Q  (By Ms. Kane)  You don't know what data

19   the Shao ransomware group had or had access to

20   when its onion site went down in November of 2022;

21   is that right?

22          MS. SIELING:  Object to form.

23      A  I don't know what data or what things from

24   an operational perspective Shao has.  What I --

25   what I do know is an agreement was consummated

Page 184

1    Q  Oh, I see.  Okay.  So these affiliates of

2    Yanluowang, they were not a part of different

3    ransomware groups?

4    **A  Well, I think you have to understand how**

5    **the threat actor ecosystem works.  So if you'll**

6    **give me a moment, I'll explain.**

7    Q  But before you do, and I appreciate the --

8    the -- the request to explain, and we will get to

9    that, but I wanted to clarify a few things before

10    that might help me here.

11    **A  Sure.**

12    Q  So your opinion -- or I guess I'll ask you

13    this.  ██████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████

████████████████████████████████████████████████████

████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████

██████████████████████████████

25    Q  Is it based on anything else?

Page 185

1  A No.

9  Q (By Ms. Kane) Can you explain that?

10  A Well, when you look at the pirates code

11 that's associated, are they going to follow the

12 pirates code that's out there?  Do they have a

13 brand that they're trying to protect?

14   When you're negotiating with someone and

15 you can't see 'em face to face and through that

16 perspective you're just dealing with a

17 back-and-forth on either email or talks or

18 telegram or an encrypted chat channel, the

19 question is do I have the trust?  Are they going

20 to abide by the terms that we are outlying?  We're

21 paying a lot of money for them to abide by those

22 terms.

23  Q So here, the identity of Shao and the

24 identity of Yanluowang were relevant for you to

25 evaluate whether or not you thought that the

1  group?

2     **A  That is correct.**

3     Q  You don't have any understanding of where

4  any data that was held by Yanluowang before they

5  went inactive, any data that they held -- let me

6  rephrase.  You don't know what the people making

7  up the Yanluowang ransom group did with any of

8  their data or resources after they expanded?

9        MS. SIELING:  Object to the form.

10    **A  I do not.**

11    Q  (By Ms. Kane) ████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████

████████████████████████████████

███████████████████████████████████████████████████

█████████████████████████████████████████████████

██████████████████████████████

██████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████

███████████████████████████████████████████

23    Q  It's possible that they were also active

24  on marketplaces that are not listed in Exhibit B

25  to your declaration?

Page 190

```
 1           MS. SIELING:  Object to form.

 2     A  It is possible.

 3        THE WITNESS:  What was that?

 4        MS. KANE:  I think it's the wind.

 5        MS. SIELING:  The wind.

 6        THE WITNESS:  Okay.

 7     Q  (By Ms. Kane)
```

1    Q   (By Ms. Kane)  As you sit here today, you

2  believe that that's an assumption you're making

3  based off of materials and information provided to

4  you by counsel?

5       MS. SIELING:  Object to form.

6    **A   I need to go back through my notes, and**

7  **then I can answer your question.**

8    Q   (By Ms. Kane)  When you say your notes,

9  what are you referring to?

10   **A   Information that I have associated with**

11 **this particular matter.**

12   Q   Are you talking about notes that you

13 created yourself, that you prepared?

14   **A   This would be information that I have in**

15 **my file.**

23   Q   (By Ms. Kane)  Skipping over to Paragraph

24 13 of your declaration, the last sentence that

25 starts on Page 4.  So "it is unclear if the



15    Q  (By Ms. Kane)  Let me ask it in a

16  different way because I think that was a bit

17  confusing.

**18    A  Okay.**

25        MS. SIELING:  Object to form.

4        Q   (By Ms. Kane)   Do you know what that

5     control entailed?

6        A   Control can mean lots of things.

16       Q   In your opinion today, is that -- well,

17    let me -- let's flip to Paragraph 27 of your

18    declaration --

19       A   Sure.

20       Q   -- on Page 8.

21       A   Thank you.   Okay.

22       Q   Your declaration, Paragraph 27, states "I

23    opine that Shao kept to the agreement and did not

24    post, sell, or otherwise make available Flagstar's

25    data from the cyber incident"; is that correct?

888-893-3767          Lexitas operates in all 50 states and is licensed where required Nevada Registration #116F.
www.lexitaslegal.com

LEXITAS

1        A   That is correct.  Yes.

2        Q   You do not opine that Yanluowang abided by

3   any terms of the agreement of Shao and did not

4   post, sell, or otherwise make available Flagstar's

5   data from the cyber incident; is that right?

6           MS. SIELING:  Object to form.

7        A   Well, my adversary in this instance is

8   Shao, based off Exhibit 9, and the agreement and

9   the -- what I opine on is that, yes, they kept to

10   their agreement.

11       Q   (By Ms. Kane)  So the answer to my

12   question is, yes, you are not rendering the

13   opinion today that Sh- -- that Yanluowang kept to

14   the agreement or the terms between Shao and

15   Flagstar and did not post, sell, or otherwise make

16   available Flagstar's data --

17       A   There is not agreement --

18       Q   -- excuse me.  Let me finish my question,

19   please.

20       A   Sure.

21       Q   -- or otherwise make available Flagstar's

22   data from the cyber incident?

23          MS. SIELING:  Object to form.

24       A   There's no agreement between Yanluo- --

25   Yanluowang -- sorry.  I always -- that's a tongue

Page 205

1    twister -- and Flagstar.  The agreement is between

2    Shao and Flagstar.



Highly Confidential                      William Hardin                      November 16, 2023

Page 210

1            MS. SIELING:  Object to form.





14     Q   (By Ms. Kane)  You mentioned a couple of

15  times some other threat actor communications that

16  you reviewed between the threat actor and Flagstar

17  in this case; that is right?

18     **A   Between the negotiator and the threat**

19  **actor, yes.**

20     Q   Besides the communications with the threat

21  actor and the negotiator and the ransom note in

22  Exhibit 9, did Flagstar's counsel provide you with

23  any other documents to review as background for

24  your analysis?

25     **A   No, they did not.**

888-893-3767        Lexitas operates in all 50 states and is licensed where required Nevada Registration #116F.
www.lexitaslegal.com

LEXITAS

1    identified suspicious activity on its network

2    which it later identified to be a part of a

3    ransomware attack."  Do you see that?

4        A  I do.

5        Q  Do you have any knowledge about the

6    factual basis for that statement?

7        A  No, I do not.

8        Q  You are not offering an opinion today as

9    to when the ransomware attack occurred; right?

10       A  I am not.

11       Q  You're not offering an opinion regarding

12   when data was stolen from Flagstar; right?

13       A  No, I am not.

14       Q  You're not offering an opinion as to what

15   data was stolen from Flagstar?

16       A  I am not, no.

17       Q  Your next sentence states "Flagstar

18   promptly initiated its incident response protocol

19   and took steps to address the incident," right,

20   "including partnering with Kroll to remediate and

21   investigate the situation."  Do you see that?

22       A  I do.

23       Q  Okay.  You are not offering any opinions

24   in this case regarding the adequacy of Flagstar's

25   data security practices; right?

1          A   I am not.

2          Q   You're not offering an opinion in this

3      case regarding the adequacy of Flagstar's response

4      to the data breach; is that right?

5          A   I am not.

6          Q   I'm going to go down to the second to last

7      bullet point.  It says "Flagstar's security

8      vendors continue to monitor the Dark Web,

9      including the site associated with the Shao

10     ransomware group, and have identified no evidence

11     that the threat actors have released any Flagstar

12     data."  Do you see that?

13         A   I do.

14         Q   Do you know who the security vendors are

15     that are mentioned in that statement?

16         A   I do not.

17         Q   Did you ask for that information?

18         A   I did not.

19         Q   Why not?

20         A   It's not relevant.

21         Q   It doesn't seem relevant to you whether or

22     not another security vendor or other security

23     vendors identified no evidence that the threat

24     actors released the data?

25             MS. SIELING:  Object to form.

1    **A  In this case, yes, I did.**

2    Q  Did you review reports from the ransomware

3    negotiators in this case?

4    **A  Well, the report to me would be the**

5    **communications between the threat actor and the**

6    **negotiator.**

7    Q  Did you review reports prepared by any

8    other experts that was retained -- that were

9    retained by Flagstar in this case?

10   **A  I did not.**

11   Q  Bullet point three on this talking points

12   memo, Exhibit 10, states "Flagstar's systems have

13   since been secured, and all unauthorized access

14   has been revoked since December 2021, which Kroll

15   has independently verified."  Do you see that?

16   **A  I do.**

17   Q  You're not offering an opinion today about

18   when Flagstar's systems were secured?

19   **A  I am not.**

20   Q  You did not -- you were not asked to

21   verify any of that information?

22   **A  I was not.**

23   Q  So besides this talking points memo and

24   the threat actor communications, were you provided

25   any other documents by Flagstar's counsel to

1  email?

2      A  Well, I -- I have --

3          MS. SIELING:  Object to form.

4      A  I have no opinion on that.  You asked me

5  to take a look at it.  ████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████

11      Q  If the threat actor had not followed

12  through on the promise to tell Flagstar where the

13  back doors in the networks were -- are or what

14  allowed the threat actor to have access to

15  Flagstar's network, would that impact your

16  analysis?

17          MS. SIELING:  Object to form.

18      A  No, it would not.

19      Q  (By Ms. Kane)  And it wouldn't impact your

20  analysis because why?

21      A  Because I was asked specifically to go out

22  to see if Flagstar information was located out on

23  the Dark Web after a payment had been made.  That

24  was my objective.  The number one objective from

25  my analysis was them demonstrating that that

Page 239

1   information had been deleted.

2       Q   Part of your analysis relies on the

3   trustworthiness or credibility of the threat actor

4   that's involved; is that right?

5           MS. SIELING:  Object to form.

6       A  Yes, it is.

7       Q   (By Ms. Kane)  And if -- whether or not a

8   threat actor follows through on a specific term

9   and an agreement, that impacts their credibility

10  or trustworthiness; right?

11          MS. SIELING:  Object to form.

12      A  Yes, it does.

13      Q   (By Ms. Kane)  So whether or not a threat

14  actor is trustworthy or credible, that's relevant

15  to your analysis; right?

16          MS. SIELING:  Object to form.

17      A   It is relevant, but as I stated in my

18  prior testimony, when you are negotiating with a

19  threat actor, you have to put a risk ranking on

20  the data points that you're going to receive from

21  them.  Number one, do I need an decryption key?

22  Number two, data.  How am I going to get it back?

23  In our situation here, we looked at the data only,

24  and we made a play for that.  They logged in, we

25  made the payment they provided in Exhibit 11.

Highly Confidential                    William Hardin                    November 16, 2023

Page 258

1        A   Some marketplaces are, yes.

2        Q   And some of the marketplaces on Exhibit B,

3    your declaration, are invite only; right?

4        A   Yes, they are.

5        Q   And so CRA has had to cultivate aliases to

6    acquire access to those marketplaces; right?

7            MS. SIELING:   Object to form.

8        A   Yes, we have.

9        Q   (By Ms. Kane)   There are marketplaces that

10   are not on your list in Exhibit B to your

11   declaration that are also invite only; right?

12       A   There can be.  Yes.

13           MS. SIELING:   Object to -- object to form.

14       Q   (By Ms. Kane)   So there are marketplaces

15   not on Exhibit B that CRA currently doesn't have

16   access to; right?

17           MS. SIELING:   Object to form.

18       A   That is correct, yes.

19       Q   (By Ms. Kane)   Do you know how many

20   marketplaces that are invite only that CRA does

21   not have access to?

22       A   I do not.

23       Q   Would it be possible to quantify the

24   number?

25       A   It would not.

Page 259

1      Q   Why is that?

2      A   Because anybody can do a pop-up

3   marketplace at any time on the Dark Web.  It

4   depends.  Seller or buyer private forum.  The

5   other thing is you've got to realize that law

6   enforcement's always scouring and looking for

7   these marketplaces.  They want to take them down.

8   As I stated earlier in my testimony, with Monopoly

9   Market.

10     Q   So marketplaces are constantly changing?

11     A   They are.

12         MS. SIELING:  Object to form.

13     A   Yes.

14     Q   (By Ms. Kane)  Including what marketplaces

15  exist that are invite only, right, they constantly

16  change?

17     A   That is correct.  Yes.

18     Q   Marketplaces could be put up and taken

19  down on the same day?

20         MS. SIELING:  Object to form.

21     A   Hypothetically, yes.

22     Q   (By Ms. Kane)  Put down and taken -- put

23  up and taken down in the same week?

24         MS. SIELING:  Object to form.

25     A   I -- I would say if someone is going to

Highly Confidential                           William Hardin                        November 16, 2023

Page 264

1       Q  Give me one second.  In this email

2   Ms. Sieling lists a number of individuals.  Do you

3   see that?

4       **A  Yes.**

5       Q  Okay.  She lists names for -- let's see --

6   Ms. Saucedo, Mr. Angus, Mr. Smith, and

7   Ms. Robbins; is that right?

8       **A  Saucedo, Angus, Smith, Robbins.  Yes.**

9       Q  Okay.  These are the only individuals that

10  you were asked to perform the person of interest

11  analysis for; is that correct?

12      **A  That is -- yes.  That is correct.**

13      Q  And John Scott -- John Scott Smith is the

14  only person from this group who was included in

15  your declaration; is that right?

16      **A  That is correct.  Yes.**

17      Q  You were not asked to complete your person

18  of interest analysis for any of the other named

19  plaintiffs in this case; correct?

20          MS. SIELING:  Object to form.

21      **A  No.  I was just asked to do the four that**

22  **are here initially.**

23          **THE WITNESS:  Sorry.  I'm going to drink**

24  **that water pitcher down.**

25      Q  (By Ms. Kane)  I'm marking as Exhibit

Page 276

1    in your analysis for this case?

2        A   Yes.

3        Q   When did you consult that resource?

4        A   **During the time period that I was looking**

5    **on the Dark Web.**

6        Q   Why did you consult that resource?

7        A   **That's one of many resources that we take**

8    **a look at.**

9        Q   Did you go to the Shao links site

10   directly?

11       A   **No, I did not.**

12       Q   Why not?

13       A   **Because the site was down.**

14       Q   So when you went to search the Shao links

15   site, it actually wasn't accessible, right,

16   directly?

17       A   **That is -- that is correct.**

18       Q   So you had to instead go through a -- a

19   different resource to try to see what was on Shao

20   links before it became inaccessible; is that

21   right?

22       A   **That is correct.  Yes.**

23       Q   So could you -- I know we discussed this a

24   little bit, but could you describe to me exactly

25   what that resource is that you went to to see what

1      A  No.

2         Q  If you could, turn to Exhibit 13 in front

3   of you.

4      A  Yes.

5         Q  If you could, turn to Page 2 out of 8.

6      A  Sure.

7         Q  The last two entries on that page.  The

8   first one's from Tuesday, December 28th at 2020 --

9   or Tuesday, December 28th, 2021, at 9:10 AM from

10  Flagstar Bank to the threat actor; right?

11     A  Yes.

17        Q  Do you see that?  Okay.

18     A  Mm-hmm.

19        Q  There are other things that are said in

20  that as well.  The response from the threat actor

21  is on Tuesday, December 28th, at 12:07 PM; right?

22     A  Yes.



1    Q  So the threat actor in this case is under

2  the impression from this communication that they

3  could sell the data anonymously and risk nothing;

4  is that right?

5        MS. SIELING:  Object to form.

6    A  Yeah, I guess.

7    Q  (By Ms. Kane)  You don't have any reason

8  to dispute that that's -- that's true?

9        MS. SIELING:  Object to form.

10   A  No.  They can go out and do whatever they

11  want with the data.

12   Q  (By Ms. Kane)  Mm-hmm.  Do You recall in

13  reviewing the threat actor communications that

14  there was a gap in time from when the ransom was

15  paid to when the data that was stolen was accessed

16  by Flagstar?

17   A  I'd have to read through the communication

18  to see if there was such a gap.  I -- I can't

19  answer that question.

20   Q  If you could go to --

21   A  One -- one thing I would like to say on

22  that statement that you said "remained completely

23  anonymous and risk nothing," that's more of a

24  proffered statement that threat actors do to get

25  you psychologically thinking they can do things.